## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Terrence P. Collingsworth, Ivan Otero Mendoza, and Albert van Bilderbeek, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. |
| Estate of Garry N. Drummond, Alfredo Araujo Castro, Augusto Jimenez, Jaime Bernal Cuellar, Jose Miguel Linares, James Adkins, James Michael Tracy, Drummond Company, Inc., Drummond Ltd.; Drummond USA, Inc. Drummond International, LLC, Itochu Coal Americas Inc., and Does 1-10; | ) ) ) ) ) ) ) | JURY TRIAL REQUESTED |
| Defendants. | ) | |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## I.    INTRODUCTION

1.      Plaintiffs Terrence P. Collingsworth, Ivan Otero Mendoza, and Albert van Bilderbeek bring this action for damages and injunctive relief against all Defendants for their unlawful conduct in conspiring with and aiding and abetting the United Self Defense Forces of Colombia (AUC), the umbrella paramilitary group in Colombia, in committing war crimes, crimes against humanity, torture and extrajudicial killings, among other crimes, in Colombia. The Defendants then engaged in a systematic cover up to hide their crimes, and this involved bribing and threatening numerous witnesses to Defendants' criminal acts. The cover up included falsely accusing Plaintiffs of bribing witnesses to provide testimony against the Defendants. Defendants used their political power, their significant resources, and their expertise at operating within the corrupt climate of Colombia to avoid accountability for their crimes going back 20 years or more. Indeed, the Drummond Defendants operate this way all over the world, even in their own

backyard. On July 20, 2018, an Alabama jury convicted Drummond Vice President, David Roberson, who was acting on behalf of Drummond, of bribing an Alabama state legislator to obtain his assistance in stopping the Environmental Protection Agency from expanding a Superfund toxic cleanup site in North Birmingham. The Drummond Defendants have no regard for the law or the public interest if their profit is at stake. These Defendants sought to damage the personal reputations of Plaintiffs to discredit the evidence they discovered and also intentionally damaged the Plaintiffs financially in retaliation for their efforts to bring the Drummond Defendants to justice. Defendants' aggressive corruption and threats were also intended to deter others from coming forward against Drummond.

2.      This is a civil action brought by Plaintiffs pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*., as well as various state and common law claims, concerning a pattern of racketeering and other wrongful activity, including defamation, intentional interference with prospective business opportunity, interference with contractual relations, and intentional infliction of emotional distress, perpetrated by Defendants Drummond Company, Inc., Drummond Ltd., Drummond USA, Inc. ("DUSA"), Drummond International, LLC (collectively referred to as "Drummond"), Garry N. Drummond, James Michael Tracy, James Adkins, Alfredo Araujo Castro, Augusto Jimenez, and Jose Miguel Linares, (collectively the "Drummond Defendants"), and Itochu Corporation ("Itochu"), and Jaime Bernal Cuellar, as well as Does 1-10.

3.      Since at least 1996, and continuing to at least 2007, these Defendants and their co-conspirators perpetrated a scheme to provide material assistance, including substantial amounts of money, to a terrorist paramilitary group, the Northern Block of the United Self Defense Forces of Colombia ("AUC"). In return, the AUC provided security for Drummond, used terror tactics to

obtain land and mineral rights for Drummond, and murdered hundreds of people who resided in the areas of Drummond's operations. The murder victims were often simply in the wrong place at the wrong time or were killed to induce their survivors to sell their land to Drummond's terrorist agents. As a result of Drummond's unlawful and criminal acts, Plaintiffs Collingsworth and Otero initiated or assisted with bringing a series of human rights cases against Drummond on behalf of decedents of those murdered. These lawsuits include *Romero, et al. v. Drummond Company, Inc., et al.*, 7:04-cv-0242-KOB (N.D. Ala.) (hereinafter "*Romero*"); *Claudia Balcero, et al. v. Drummond Company, Inc., et al.*, 2:09-cv-1041-RDP (N.D. Ala.) (hereinafter "*Balcero*"); *Baloco, et al. v. Drummond Company, Inc.*, 7:09-cv-00557-RDP (N.D. Ala.) (hereinafter "*Baloco*"); and *Melo, et al. v. Drummond Company, Inc.*, 2:13-cv-00393-RDP (N.D. Ala.) (hereinafter "*Melo*"). These cases are based on substantial evidence of Defendants' criminal acts and other wrongful conduct.

4.      Ultimately unable to defend themselves on the merits of the charges and claims, Defendants bribed witnesses, threatened witnesses, falsely accused Plaintiffs of fabricating evidence, and used all of their tools to avoid criminal prosecution in Colombia and the United States and to avoid civil liability. This unlawful cover up continues to this day. Plaintiffs bring their claims here to obtain damages and injunctive relief for Defendants' wrongful acts directed at them, and to establish the true facts of the Drummond Defendants' criminal acts and ultimate liability for the victims of Defendants' human rights crimes in Colombia. Plaintiffs further seek to restore their wrongfully damaged reputations and recover damages for their lost income and opportunity caused by Defendants' intentional campaign to damage Plaintiffs' livelihoods in retaliation for exposing Drummond's human rights crimes in Colombia.

## II.    SUBSECT MATTER JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1332, and under 18 U.S.C. § 1964(c).  Plaintiffs' first claim for relief is a federal law claim arising under 18 U.S.C. § 1961, *et seq.*, and thus 28 U.S.C. § 1331 provides this Court with subject matter jurisdiction.  There is also diversity of citizenship, and the amount in controversy, including compensatory and punitive damages, exceeds $75,000.  Accordingly, this Court also possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (a)(3). If for any reason diversity jurisdiction is found not to exist, Plaintiffs reserve the right to amend their complaint in order to perfect diversity jurisdiction.

6.     Plaintiffs' state law claims arise out of the same case or controversy as their federal law claims and involve a common nucleus of operative facts.  Thus, this Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2). The claims presented here against these Defendants have not been presented in any other court in the United States and the claims are factually distinct from any claims any of these Defendants have asserted against these Plaintiffs. Further, a substantial part of the events or omissions giving rise to the severe damages suffered by Plaintiffs due to Drummond's wrongful acts against the Plaintiffs occurred in this District and the only connection to Alabama is that some of the Defendants reside there and made some decisions in Alabama to cause injury to the Plaintiffs. Much of the injury, as Defendants knew, would occur in this forum, Washington D.C., to Plaintiff Collingsworth, who Defendants have designated as the "ringleader" of the efforts to bring Drummond to justice. Plaintiffs' claims do not arise out of the same transaction or occurrence of

any other pending case for purposes of Fed. R. Civ. P. 13 (a)(1)(A) as the frivolous libel and RICO cases filed by Drummond, discussed in paragraphs 157-162, *infra*, are classic retaliatory Strategic Litigation Against Public Participation ("SLAPP") suits that have no merit whatsoever. The allegations made against Plaintiffs in those cases did not occur and are false. However, even if they did occur in whole or in part, they are separate and distinct from the allegations herein which were committed by Defendants with the intent to harm Plaintiff Collingsworth in Washington, D.C. and do general damage to the reputations and economic prospects for all Plaintiffs. Thus, the claims herein do not arise out of any allegations made against Defendants herein about Plaintiffs' alleged conduct in Colombia. Venue is also proper in this District under 18 U.S.C. § 1965 (a) as the Drummond Defendants have various agents operating in this District and they conduct business in this District.

### III.  PERSONAL JURISDICTION

8.      Exercise of personal jurisdiction over Defendants is appropriate in this District because they have falsely accused Plaintiffs within this District, and Defendants intended the effects of their threats and other retaliation to be felt in Washington, D.C. by Plaintiff Collingsworth, who Drummond knows resides and practices law in Washington, D.C.   All Defendants conspired to injure Plaintiff Collingsworth, along with the other Plaintiffs, and all Defendants knew that Plaintiff Collingsworth would suffer injuries in Washington, D.C. Defendants also all knew that Plaintiffs would not suffer any injuries in Alabama, where none of them reside or have any business or personal interests. Also, personal jurisdiction over Defendants is proper under 18 U.S.C. § 1965.

## IV.   PARTIES

### A.  Plaintiffs

9.      Plaintiff Terrence P. Collingsworth is a human rights lawyer and Executive Director of International Rights Advocates. Plaintiff Collingsworth is lead counsel in the various human rights cases against Drummond as described in paragraph 3, *supra*. He is also a defendant in the frivolous SLAPP suits for defamation and RICO brought by Drummond to damage him financially and cause him serious reputational injury.  At all times material hereto, Plaintiff is and was a resident of Washington, D.C. Through false statements to the press and to others, including those with professional ties to the Plaintiffs, the Drummond Defendants have also acted to damage him financially and cause him serious reputational injury.

10.      Plaintiff Albert van Bilderbeek was born in The Netherlands and is a dual Dutch-U.S. citizen. He is a former United States Marine. His Dutch father was a petroleum engineer for Shell Oil stationed in Colombia, and his mother was a Colombian national. Her father was a highly decorated two star general of the Colombian Army, Ambassador to France and a Colombian Senator. Plaintiff van Bilderbeek's uncle was a highly decorated four star general in the Colombian army and was chief of staff of the Colombian armed forces. He was also a former Minister of Defense and Colombian ambassador to The Netherlands. Plaintiff van Bilderbeek is the acting CEO of Llanos Oil Exploration Limited, whose founding member was the former General Secretary of Colombian Ministry of Energy. He is a resident of Amsterdam, the Netherlands. He has endured a long legal battle with the Drummond Defendants and their collaborators following Drummond's collusion with Ecopetrol to actively participate in the unlawful appropriation of Llanos's valuable oil lease in Colombia. Several U.S. companies contracted by van Bilderbeek (such as Halliburton, Parker Drilling, and Western Atlas) were all

6

affected by the loss of van Bilderbeek's oil contract. He wrote former President Bush, and his case was taken before the US Embassy in Bogota and was brought to the attention of former Colombian President Pastrana, who ordered the reinstatement of van Bilderbeek's oil contract. When it became apparent his oil rights were to be returned by the Colombian government, the Drummond Defendants and their collaborators launched a massive distortion campaign against him and his company, accusing them both of criminal wrong doing. In response, van Bilderbeek filed a seven (7) billion euro lawsuit for the loss of his oil income in the Court of The Hague. The judge ruled in favor of Llanos Oil allowing the company to seize up to seven (7) billion euros in assets of Ecopetrol within the jurisdiction of the Netherlands. The Dutch government, prime-minister, and minister of foreign affairs were actively involved in the case, including heartfelt support from the Queen of The Netherlands. Plaintiff van Bilderbeek was named as a defendant in the SLAPP suit under RICO brought by Drummond to damage him and his company financially and cause him serious reputational injury. Through false statements accusing him of money laundering and witness bribery to the press and to others, including those with professional ties to the Plaintiffs, the Drummond Defendants have also acted to damage him financially and cause him serious reputational injury. These false statements have been made continuously and up to the present. The Drummond Defendants made these false accusations against Plaintiff van Bilderbeek even though he was never charged for any wrongdoing by U.S. or Colombian authorities. Further, van Bilderbeek and Llanos Oil were fully cleared by the Colombian Attorney General following the initial false charges made by the Drummond Defendants. Plaintiff Collingsworth has for many years provided Plaintiff van Bilderbeek with legal advice and representation within the District of Colombia.

11.    Plaintiff Ivan Otero Mendoza is a resident of Colombia, where he is a lawyer and law professor. He is co-counsel with Plaintiff Collingsworth in the various human rights cases against Drummond as described in paragraph 3, *supra*. He is also a defendant in the SLAPP suit under RICO brought by Drummond to damage him financially and cause him serious reputational injury.  Through false statements to the press and to others, including those with professional ties to the Plaintiffs, the Drummond Defendants have also acted to damage him financially and cause him serious reputational injury. Plaintiff Otero has traveled to Washington, D.C. on numerous occasions to meet with Plaintiff Collingsworth to address the attacks by the Drummond Defendants on them.

### B. Defendants

12.    Defendant Drummond Company, Inc. is a for-profit corporation incorporated in Alabama that is engaged primarily in the mining and shipment of coal. It is a closely-held corporation owned by the Drummond family, and was controlled in its day-to-day operations by Garry N. Drummond. Its principal place of business is located at 530 Beacon Parkway, Suite 900, Birmingham, Alabama 35209. Among other places, Drummond Company, Inc. owns and operates a large coal mine, rail line and port in Colombia, South America. The operations in Colombia are financed and managed from the Alabama headquarters of Drummond Company, Inc., and the profits from the Colombia operations revert to Drummond Company, Inc.

13.    Defendant Drummond Ltd. is an Alabama company, incorporated in Jasper, Alabama, and has its principal place of business at 3000 Highway 78, Jasper, Alabama 35501.  It is wholly-owned by Drummond Company, Inc. and/or Drummond International, LLC. Drummond Ltd. manages the day-to-day operations of the Drummond coal operations in Colombia, but is at all times operating under the complete ownership, direction and control of

Defendant Drummond Company, Inc. Fully aware of the violence in Colombia, particularly anti-union violence, and the absolute impunity afforded the perpetrators of such violence in Colombia, Drummond Company, Inc. created Drummond Ltd. for the sole purpose of operating the Colombian mines for the sole benefit of Drummond Company, Inc. while also attempting to shield Drummond Company, Inc. from liability for any and all tortious conduct committed by the management of these mines.  The creation of Drummond Ltd. was purely intended for the aforesaid unlawful purpose. In June, 2011, Defendant Itochu Coal Americas purchased a 20% interest in Drummond's Colombia operations. Drummond and Itochu created Drummond International, LLC, a new shell corporation, to hold their respective 80% and 20% shares in Drummond, Ltd.

14.     Defendant Drummond Company, Inc. and Drummond International are jointly and severally liable for all of the tortious actions committed when its alter ego and/or agent, Drummond Ltd., acts in concert with any other person or entity in furtherance of Drummond's business interests and activities. Defendant Itochu Coal Americas had specific knowledge of Drummond's unlawful activities in Colombia when it purchased 20% of Drummond Ltd. in 2011. By knowingly providing substantial support for Drummond's criminal enterprise in Colombia, Itochu aided and abetted Drummond's wrongful acts, and it joined an ongoing conspiracy to commit unlawful acts in Colombia. Itochu is also vicariously liable for any unlawful acts committed after June, 2011 when it became partners with Drummond in the Colombia operations.

15.     Garry N. Drummond was the CEO of Defendant Drummond Company, Inc. until July 13, 2016, when he died. He was a resident of Alabama and was responsible for final decisions on behalf of the Drummond Defendants to fund the AUC and to murder the

Drummond union leaders, as well as retaining the AUC to drive the guerillas out of areas where the company had facilities, resulting in the deaths of thousands of innocent people. He also was a key participant in the Drummond Defendants' illegal cover up activities and for bringing the SLAPP suits against the Plaintiffs herein. His Estate is named as a party following his death.

16.     Defendant Augusto Jimenez is a resident of Wellington, Florida and was the President of Defendant Drummond Ltd. At all material times herein, Jimenez was a direct participant in Drummond's plan to make significant payments to the AUC, specifically to murder the three trade union leaders Locarno, Orcasita, and Soler, and more generally to provide support to the AUC to provide "security services" at the company mine and along its railroad line. Jimenez lied under oath is stating that he was not in Colombia when the union leaders were murdered. Immigration records obtained by Plaintiffs prove that he was in Colombia for the murders. He was also a key participant in the Drummond Defendants' ongoing efforts to cover up their criminal activities and to seek to damage Plaintiffs in retaliation for Plaintiffs' efforts to expose Drummond's criminal acts.

17.     Defendant Jose Miguel Linares is a Colombian national residing in Bogota, and he was hand-picked by Augusto Jimenez to be Drummond Ltd.'s in-house counsel, and he served as Jimenez's right-hand man in all wrongful acts alleged herein. He became President of Defendant Drummond Ltd. when Defendant Jimenez retired in 2013. At all material times herein, Linares was a direct participant in Drummond's plan to make significant payments to the AUC, specifically to murder the three trade union leaders Locarno, Orcasita, and Soler, and more generally to provide support to the AUC to provide "security services" at the company mine and along its railroad line. He was also a key participant in the Drummond Defendants' ongoing

efforts to cover up their criminal activities and to seek to damage Plaintiffs in retaliation for Plaintiffs' efforts to expose Drummond's criminal acts.

18.     Defendant Alfredo Araujo Castro is a Colombian national residing in Valledupar, and is a Vice President at Drummond Ltd. Among other positions, he is the Director of "Community Relations," a post that has allowed him to be one of the liaisons with the AUC for Drummond. He has been close friends with Rodrigo Tovar Pupo, the AUC Commander "Jorge 40," since childhood.  Defendant Araujo used this relationship to make the initial arrangement with Jorge 40 to provide security for Drummond. Araujo made the plan with Jorge 40 and then used his position in the company to get Defendant Jimenez and others to agree to the plan to make substantial payments to the AUC. Araujo, on behalf of Drummond, shared with AUC the goal of using the ongoing civil conflict as a cover to execute leftist union leaders, including those employed by Drummond. He was also a key participant in the Drummond Defendants' ongoing efforts to cover up their criminal activities and to seek to damage Plaintiffs in retaliation for Plaintiffs' efforts to expose Drummond's criminal acts.

19.     Defendant James Adkins is a U.S. Citizen who resides in West Virginia. He was the Director of Security for Drummond's operations in Colombia. Hired by Drummond from the CIA, Adkins had full knowledge of the terrorist activities of Colombian paramilitary groups at the time he was hired. Adkins reported to both Defendant Garry Drummond and Defendant Mike Tracy, as well as other Alabama-based Drummond officers, including Augusto Jimenez, President of Defendant Drummond Ltd. On behalf of the Drummond Defendants, Adkins approved the payments to the AUC and its predecessor paramilitary groups as described herein. During his years of service for Drummond, between 1995-2002, Adkins traveled to Alabama every four to six weeks to brief Defendant Garry Drummond, Defendant Mike Tracy, and other

Drummond officials on security issues, including Drummond's support for the AUC. Adkins regularly told the AUC leaders and their intermediaries that he went to Alabama regularly to brief Defendant Garry Drummond and obtain his consent to key strategic issues, including providing support to the AUC. Adkins obtained consent in Alabama from Defendant Garry Drummond to provide substantial support to the AUC. He was also a key participant in the Drummond Defendants' ongoing efforts to cover up their criminal activities and to seek to damage Plaintiffs in retaliation for Plaintiffs' efforts to expose Drummond's criminal acts.

20.     At all times relevant to the allegations herein, Defendant James Michael ("Mike") Tracy, who resides in Alabama, was an executive at Drummond Company Inc. or Drummond Ltd. Defendant Tracy oversaw the start of operations for Drummond's mine in Colombia. Defendant Tracy was in charge of all aspects of the Drummond mining operation in Colombia and reported directly to Defendant Garry Drummond. Defendant Tracy was fully briefed by Adkins of the agreements made with the AUC, and he approved of Drummond's direct collaboration with the AUC terrorists. On numerous occasions, Defendant Tracy himself met with AUC commanders to discuss the status of the AUC's work on Drummond's behalf. Upon Garry Drummond's death, Tracy became CEO of Drummond Company, Inc.

21.     Defendant Jaime Bernal Cuellar, a Colombian national residing on Bogota, is the Drummond Defendants' lead lawyer in Colombia. He used his strong political connections to manage to keep Drummond from being prosecuted for war crimes, murder, and financing the AUC for many years. He is a former Attorney General of Colombia and is very well connected to the political and judicial elites of Colombia. He is very close friends with the prior Attorney General, Eduardo Montealegre Lynett, whose office turned a blind eye towards clear evidence of Drummond's role in the murders of the Drummond union leaders and the financing of the AUC

by the Drummond Defendants. Indeed, Bernal was a law partner with Montealegre, they wrote books together, and Bernal is the godfather of one of Montealegre's sons. Defendant Bernal is also close personally and professionally with the current Attorney General, Néstor Humberto Martínez, whose office is also resisting calls for Drummond to be formally investigated and prosecuted for financing the AUC, among other crimes. Defendant Bernal also orchestrated efforts by the Drummond Defendants to attempt to silence witnesses through bribes and threats. He was also a key participant in the Drummond Defendants' ongoing efforts to cover up their criminal activities and to seek to damage Plaintiffs in retaliation for Plaintiffs' efforts to expose Drummond's criminal acts.

22.     Doe Defendants 1-10 are persons currently unknown who assisted the Drummond Defendants in their bribery and threats to potential witnesses of Drummond's criminal acts and/or assisted in covering up Drummond's criminal acts. These individuals made every effort to conceal their identities and their criminal acts, and they can only be identified in the discovery process by the Drummond Defendants.  These may include Drummond's outside counsel in their frivolous SLAPP suits, including, but not limited to, Tony Davis, Trey Wells and Ben Presley of the firm Starnes, Davis Florie, LLP and Sara Kropf. Plaintiffs do not yet have sufficient facts to know the role of these lawyers in assisting Drummond in hiding and denying their crimes. Plaintiffs believe that either these outside counsel are complicit in the cover up activities or have been willfully ignorant of Drummond's crimes. This filing, as well as the record facts, make it impossible for them to continue to claim ignorance.

## V.     BACKGROUND FACTS REGARDING THE DRUMMOND DEFENDANTS' HUMAN RIGHTS CRIMES IN COLOMBIA AGAINST COLOMBIAN NATIONALS.

23.     Drummond's Colombian coal mine is located in La Loma, Cesar Province, and "Puerto Drummond," where it ships its coal from, is located 120 miles to the North in Santa Marta, Magdalena Province. A map of the region of Drummond's operations is attached hereto as Exhibit 1. Drummond's Colombian coal contains a very low sulfur content, making it attractive to countries and states aiming to lower the pollution produced from coal-burning power-plants. According to Drummond's website, www.drummondco.com, they increased production in Colombia to 25 million tons a year by 2011. Drummond obtained the mining rights in the mid 1980's, but did not start real production until 1995. By then, both mine and port areas were essentially under the control of the main leftist guerilla group in Colombia, the Revolutionary Armed Forces of Colombia ("FARC"). From the outset of its operation, Drummond, like virtually all landowners and large businesses in these areas of Colombia, suffered attacks by the FARC. As a communist-inspired organization, the FARC sought to overthrow the Colombian government with violent means, seize large private lands and privately-owned natural resources, such as Drummond's vast coal mine, and redistribute this wealth to the Colombian people.

24.     The AUC began establishing a presence in Cesar and Magdalena for the sole purpose of attacking and defeating the FARC in these areas where there were important and powerful business interests and where the FARC had established a significant foothold. The FARC operated out of the Sierra Nevada mountains, more or less between Santa Marta and Drummond's mine, which allowed the FARC to strike Drummond's assets and their rail line.  By 1997, the areas of Cesar and Magdalena became embroiled in the civil conflict that had engulfed Colombia as the Colombian military and the AUC joined forces to battle the FARC.

25.     Drummond initially stated, at least for public relations purposes, that it would remain neutral in the civil conflict between the leftist guerillas, particularly the FARC, and the

Colombian military and its AUC paramilitary proxies. In a September 13, 1995 memo from James Adkins (former Director of Security for DCI) to Defendant Tracy, attached as Exhibit 2, Adkins as head of security for Drummond indicated that he was perplexed as to why the guerillas had yet to make a significant attack on Drummond. He suggested that the short-term goal for the company should be to keep its head down and mine coal. However, according to Drummond security reports, the company was formally declared a military target by the guerillas in 1995.

26.     After considering the various options, Drummond chose to enter the conflict. By no later than 1997, Drummond formally took a side in the civil conflict and joined with the AUC to defeat the FARC and drive its remnants out of Cesar and Magdalena Provinces. For its part, Drummond financed a significant expansion of the AUC's Northern Block, including the Juan Andres Alvarez Front, based in Cesar Province. Along with providing this Front with significant funds to arm and supply over 165 new soldiers, Drummond provided it with its day-to-day operating expenses. Defendant Garry Drummond expressly approved this plan, and gave the approval to Drummond's head of security, Adkins. Drummond also provided funds directly to Jorge 40, Commander of the Northern Block of the AUC, to assist other AUC units in the areas of Drummond's operations in Cesar and Magdalena Provinces. One of the goals of the Northern Block was to purge the FARC from their hideouts in the Sierra Nevada mountains.

27.     Drummond's massive and important funding for the AUC re-prioritized and directed the strategy of the AUC, and Drummond conditioned ongoing support on requiring the AUC to focus on defeating the FARC and eliminating its supporters and sympathizers from the area of Drummond's railroad line going through Cesar and Magdalena Provinces. Drummond also favored contractors that had direct ties to the AUC and/or were known supporters of the AUC. These included Jaime Blanco Maya, whose company ISA had the food service contract for the

Drummond mine, as well as for the two firms that provided security for Drummond's rail line: Secolda and Viginorte, and Sanchez Polo, a trucking company that hauled Drummond's coal and supplies.

28.     Colombian military units were stationed in and around Drummond's mine and port facilities, reflecting Drummond's strong and corrupt connections to the Colombian government. These troops were in essence privatized by Drummond and were supported by substantial resources from Drummond. These troops also provided substantial logistical and tactical support to the AUC in the areas of Drummond's operations. Drummond's security department gathered intelligence about guerilla operations in Cesar and Magdalena Provinces and provided it to, among others, Colombian Military Intelligence Commander Lino Sanchez, who then shared the information with AUC commanders in the area. The Colombian military supported by Drummond also lent arms to the AUC and participated in joint operations with the AUC in their united fight against the FARC and the National Liberation Army ("ELN") guerillas.

29.     As a result of Drummond's direct intervention in the civil conflict in these areas, hundreds of people living in and around Drummond's railroad corridor, including places that had previously served as safe havens for FARC and ELN guerillas, were executed as the AUC utilized its well-known scorched earth methodology as a way to terrorize the local population and ensure they would no longer support or sympathize with the guerilla groups.  Among those killed by the AUC in these operations were family members of the Plaintiffs in the human rights cases described in paragraph 3, *supra*. These executions were war crimes and extrajudicial killings in violation of international law and the laws of Colombia and the U.S. Further, Drummonds' financing of the AUC, designated a terrorist organization on September 10th, 2001 by the U.S. State Department, also violated international law as well as the laws of Colombia and the U.S.

30.     The facts regarding Drummond's direct support to the AUC could not have been known until the 2006 demobilization of the AUC. Until then, the AUC, Drummond, and some members of the Colombian military were the only parties with knowledge of their illegal relationship and neither had an interest in admitting it. However, following the demobilization and the start of the Justice and Peace ("J&P") process in 2006, former AUC commanders had an incentive to reveal the truth: the terms of the J&P process were that AUC members would get substantially reduced sentences only if they fully revealed their war crimes and other criminal acts.

31.     The Drummond Defendants were able to keep most of their close allies in the J&P process quiet for a time with bribes and/or threats against the witnesses and their families. However, one by one, the AUC witnesses began to testify about Drummond's key role in financing the AUC and its many war crimes against innocent civilians.  The Justice and Peace process, which started yielding new facts in 2007, changed the dynamic of the prior bond and shared mission between the AUC, the Government of Colombia, and the business community operating in Colombia, including Drummond. Many of the AUC leaders spoke freely about their relationship with the elites of the Colombian business community, particularly the Drummond Defendants, and their direct collaboration with the Colombian military, because, among other reasons, the AUC leaders have expressed that they felt betrayed by their former government and business partners. The AUC leaders were imprisoned for their role in a shared crime, while the businessmen and politicians who were their partners remained free and enjoyed the substantial fruits of their criminal enterprise.

32.     The key AUC leaders and members who worked directly with Drummond are now in custody or have already served their time as part of the J&P process in Colombia and are giving testimony and speaking to government and human rights lawyers about their alliance with

Drummond. These include Salvatore Mancuso, the former head of the AUC, serving time in a U.S. prison, Jhon Jairo Esquivel Cuadrado, alias "El Tigre," a former commander of the Juan Andres Alvarez Front assigned to Drummond, Alcides Manuel Mattos Tabares, alias "Samario", a former subcommander of the Juan Andres Alvarez Front,  Jairo Jesus Charris Castro, a former AUC member who was sentenced to 30 years in prison for his role in murdering the union leaders at Drummond, and Rafael Garcia, a high official of the Colombian Administrative Department of Security (Spanish acronym: DAS; similar to the FBI), who was also a political advisor to the top leaders of the AUC, including Rodrigo Tovar Pupo, alias "Jorge 40," the leader of the AUC's Northern Block.

33.    While Jorge 40 has either refused to talk about Drummond or has denied any connection to Drummond, once he was extradited to the U.S. for drug trafficking, on April 30, 2009, his U.S. lawyer made a proffer to the Justice Department offering to enter into a plea agreement in exchange for Jorge 40's testimony that Defendant Adkins, acting on behalf of Drummond, paid the AUC $20,000 to murder the top two leaders of Drummond's Colombian mine, Locarno and Orcasita and that Adkins later met with Jorge 40 directly to make additional arrangements for Drummond to provide assistance to the AUC. *See* Exhibit 3 at 3-4. The latter fact of Jorge 40's meeting with Defendant Adkins was confirmed by 2009 J&P testimony provided by AUC Commander Mancuso. Exhibit 4 at 64-66. Jorge 40 remains imprisoned in the U.S. Based on information and belief, he has made a financial arrangement with Defendant Araujo to keep quiet about the close connection between his Northern Block and Drummond.

34.    The Drummond Defendants have a personal and direct connection to the origin of the AUC. Alfredo Araujo, Drummond's Director of Community Relations, was a close friend since childhood of Rodrigo Tovar Pupo, alias Jorge 40, who was one of the original founders of the

AUC along with Carlos Castaño and Salvatore Mancuso. Several of Araujo's close relatives joined Jorge 40 as active members of the AUC. Three close family members of Araujo's, his cousin, Hernando Molina Araujo, a former governor of Cesar Province, another cousin, Alvaro Araujo Castor, a former Senator, and his uncle, Alvaro Araujo Noguera, a former Minister of Agriculture, are in jail for their support for the AUC. Araujo used his family relationship and connection to Jorge 40 to make arrangements for Drummond to make substantial payments to the AUC. Araujo made the plan with Jorge 40. He then used his position in the company to get Jimenez and others to agree to the plan to make substantial payments to the AUC. Araujo, on behalf of Drummond, shared with the AUC the goal of eradicating the FARC and other leftist guerillas and prevailing in the ongoing civil conflict.

35.     Araujo was also a friend of Jaime Blanco Maya, who had close ties to both the AUC and to the government. Araujo brought Blanco into the Drummond fold by arranging to have Drummond award his company, ISA, the food concession for the workers at the Drummond mine. Blanco was close friends with Oscar Jose Ospino Pacheco, alias "Tolemaida", one of the AUC Northern Block's top commanders under Jorge 40. At the same time, Blanco's half-brother, Edgardo Maya, was until recently the Government of Colombia's Inspector General. Jaime Blanco Maya is now in prison for his ties to the AUC and his admitted role in the conspiracy to murder two of the top union leaders at Drummond's coal mine, Locarno and Orcasita.

36.     While Carlos Castaño is either dead or disappeared, the other two AUC founders, Salvatore Mancuso and Jorge 40, both now in prison in the United States following plea agreements on drug trafficking charges, have, as previously alleged, stated that Drummond was one of the U.S. multinationals that provided substantial support to the AUC that allowed it to buy arms and equipment and join the war effort to defeat the FARC. Jorge 40 has since declined to

testify about Drummond because Defendant Araujo made a financial arrangement with him to keep silent about Drummond.

37. The Drummond Defendants provided substantial support to the AUC and are, at a minimum, guilty of providing knowing and substantial support to a terrorist organization with full knowledge of the activities of that terrorist organization. As is described more fully herein, Drummond provided millions of dollars to the AUC to support its war with the FARC, and Drummond established, equipped, supported, and directed the AUC's Northern Block in its actions in engaging the FARC in the towns along Drummond's 120-mile railroad line from its mine in La Loma to "Puerto Drummond" in Santa Marta. Drummond became a major supporter of the AUC war effort to defeat the FARC and provided support from approximately 1997 to 2006, when the AUC formally began demobilizing after its efforts to destroy and contain the FARC were largely successful. Indeed, on May 14, 2018, following a lengthy independent investigation of the key witnesses and documents, Colombian Special Prosecutor No. 247 recommended opening a formal investigation of Drummond's financing of the criminal acts of the AUC. That recommendation was stalled for months before Attorney General Néstor Humberto Martínez and his Transitional and Delegate Justice Directorate Against Organized Crime, a three-member committee that the Attorney General tasks with approving recommendations to prosecute. On information and belief, the Drummond Defendants, led by Defendant Bernal, used their strong political connections to pressure the Attorney General to take no action on the recommendation. Representatives of the victims of Drummond's war crimes petitioned Prosecutor No. 247 to explain why no action has been taken to open the investigation. His response, noting that on May 14, 2018, he recommended that the investigation be opened and then, according to internal regulations, he referred the recommendation to the Transitional and Delegate Justice Directorate Against Organized Crime

committee, is attached hereto as Exhibit 5. After doing nothing for four full months, on September 13, 2018, the Transitional and Delegate Justice Directorate Against Organized Crime committee responded that the matter was not their responsibility and Prosecutor No. 247 had the authority to act. *See* Exhibit 6.   However, Prosecutor No. 247 was apparently reluctant to act until further internal discussions confirmed his authority to move forward with the investigation. On October 9, 2018, Prosecutor No. 247 formally launched a criminal investigation against the Drummond officials who were involved in financing the AUC's war crimes. A copy of the formal investigation document is attached as Exhibit 6A. This action was taken despite months of Drummond's efforts to prevent it. Public and political pressure finally caused Colombian authorities to deny Drummond its normal impunity. Shortly after Prosecutor No. 247 launched his investigation, he was summarily transferred to another division and removed from the Drummond case by the Attorney General. He was replaced by Prosecutor No. 251, Diana Mercedes Salazar Solisa, who was reputed to be more susceptible to Drummond's influence. Lawyers for the victims of Drummond's collaboration with the AUC filed a petition protesting the Attorney General's corrupt act of removing Prosecutor No. 247. On January 28, 2019, the Vice Attorney General, Maria Paulina Riveros Duenas, reinstated Prosecutor No. 247. *See* Exhibit 6B.

38.     Specifically, Drummond began paying the AUC through Jaime Blanco no later than early 1997.  When Adkins brought Garry Drummond the idea, Garry Drummond agreed to make payments to the AUC. The payments were first made by Adkins bringing cash payments in increments of $10,000 from Alabama.  Blanco would deliver the cash payments from Adkins to the AUC.  After some time, Adkins and Blanco developed another scheme to funnel money to the AUC through Blanco.  Blanco would use inflated invoices for services provided to Drummond, and he would provide the overage to the AUC.  This method of using false invoices to hide illegal

payments was devised by Defendant Adkins, who, prior to coming to work for Drummond, was fired by the CIA for his role in the Nicaraguan Contra scandal. Adkins was found by Lawrence Walsh, appointed as Independent Counsel to investigate the Iran-Contra conspiracy, to have violated the law by providing support to the Contras, falsifying CIA financial accounts to hide his crime, and lying to investigators.  Exhibit 7 (Independent Counsel Walsh's final report to Congress).  Drummond also had experience in hiding bribery payments by burying them in seemingly legitimate payments. In the Alabama EPA bribery scandal that resulted in the July 2018 bribery conviction of Drummond Vice President, David Roberson, who was acting on behalf of Drummond, the bribes paid to the Alabama state legislator, Oliver L. Robinson, Jr., to obtain his assistance in stopping the Environmental Protection Agency from expanding a Superfund toxic cleanup site in North Birmingham, were paid into a foundation established by Robinson to conceal the bribery. *See* Exhibit 7A (April 24, 2019 Washington Post article by Steven Mufson). As described further herein, the Drummond Defendants used other methods to provide support to the AUC during the relevant time period, but one early method was funneling the money to the AUC through Blanco buried in false invoices as described above.

39.     Shortly after he was hired, Adkins reported to the Drummond Defendants that the Cordoba Battalion Commander of the Colombian military requested funds from Drummond in September 1995 to support "Plan Convivir," the military's effort to form and fund paramilitaries. Exhibit 2.

40.     Adkins reported to the Drummond Defendants on the army's control over the paramilitaries and the success of the paramilitaries in fighting the guerillas. He stated, "Plan Convivir is beginning to take shape in our area of concern. The infamous Rambo, otherwise known as Fidel Castaño, has been busy in the Banana Zone nearest to us."  He also discussed the success

of two other paramilitary groups, the "Chepe Barrerra" group and the "Victor Carranza" group. He reported that ***"[t]hese paramilitary groups are under the control of the military and have made it inadvisable for small guerilla groups to appear in towns and villages in our area of operations."*** He noted "at least 30 new paramilitaries reportedly have been activated in this zone to eliminate the guerilla and bandit presence," and "their presence is having some effect." Exhibit 8 at 2 (emphasis added). Adkins provided numerous other security reports for the Drummond Defendants. Adkins referred to armed support to Drummond and the military being provided by "cowboys," a code for the AUC.  Exhibits 8, 9, 10, 11.

41.     Drummond provided substantial support to the Colombian military with no controls on the use of these funds and allowed the military to use the funds for any purpose, which could have included making contributions to the AUC. Exhibit 10, an Adkins memo, states, "We also threw in the millions that we were pouring into the country and region in the form of royalties and taxes, especially war taxes." Adkins admitted in a deposition that he had no idea what the military did with the war taxes collected. Exhibit 12, Adkins Dep 206:16-21. [Exhibit 12 will be filed under seal]. *See also*, Exhibit 13, Tracy Dep 177:17-178:13 (no way to tell if military used funds for Operation Convivir); Exhibit 14, Zervos Dep 200:6-201:25 (Garry Drummond approved a $1.1 million payment to military). Garry Drummond himself admitted that he did not verify what the military did with its funds Exhibit 15, Drummond Dep 142:1-143:3. These were voluntary payments made by Drummond to obtain security cooperation from the Colombian military, which was itself providing funds, equipment and logistical support to the AUC.

42.     The Drummond Defendants knew as early as September 1995 from a report by Adkins that ***the military's plan to organize and fund paramilitary groups "will bring with it egregious human rights violations"*** Exhibit 2 at 2 (emphasis added).

43.     According to the testimony of multiple former AUC members, the violent crimes against civilians were designed to "cleanse" or "pacify" the civilian populations around the Drummond facilities. Acting on behalf of Drummond, the AUC executed hundreds if not thousands of innocent civilians using tactics of terror and violence, particularly in the areas that the FARC had a stronghold. These areas included Cesar Province [where Drummond's mine is located] and Magdalena Province [where Drummond's port is located]. In these areas, the AUC pursued a scorched earth policy of first driving the FARC out and then brutally murdering and torturing people who lived in these areas and were assumed by the AUC to be sympathetic to the FARC. As Jose Gregorio Mangones Lugo, alias "Carlos Tijeras," who was an AUC commander in Magdalena where Drummond's port is located, stated in a declaration, "We not only drove the guerilla groups out of the area, but our tactics made sure the local people would never entertain the idea of supporting or joining the guerillas. We made clear with our actions that anyone who supported the FARC was our enemy and would be dealt with accordingly." Exhibit 16 at ¶ 24 G.

44.     The AUC used extremely violent means to take back areas held by the FARC and used tactics of violence and terror to depopulate areas of innocent civilians merely because the AUC presumed that civilians in areas previously held by the FARC were sympathetic to the leftist guerillas. This military tactic is documented by the U.S. State Department. For example, the 1997 State Department Report noted that "[t]he many paramilitary groups took the offensive against the guerillas, often perpetrating targeted killings, massacres, and forced displacements of the guerillas' perceived or alleged civilian support base . . . ***An active policy of depopulation, pursued by some paramilitary groups against communities suspected of guerilla support***, was the primary cause of the growing internal displacement problem." 1997 State Department Report at 2 (emphasis added)(www.state.gov/j/drl/rls/hrrpt).

45.     As the U.S. State Department reported in 1999:

Paramilitary groups and guerillas were responsible for the vast majority of political and extrajudicial killings during the year. ***Throughout the country, paramilitary groups killed, tortured and threatened civilians suspected of sympathizing with guerillas in an <u>orchestrated campaign </u>to terrorize them into fleeing their homes, thereby depriving guerillas of civilian support.  The AUC paramilitary umbrella organization . . . exercised increasing influence during the year, extending its presence through violence and intimidation into areas previously under guerilla control***.

1999 State Department Report at 2 (emphasis added)(www.state.gov/j/drl/rls/hrrpt).

46.     These consistent and reliable reports by the State Department of the AUC's tactics in terrorizing villagers are exactly what happened in the areas around Drummond's facilities where the Drummond Defendants unleashed the AUC to attack the nearby villages.  The AUC was designated a terrorist organization by the U.S. State Department on September 10, 2001. 66 Fed. Reg. 175, 47054 (Sept. 10, 2001). The designation was based on the AUC's consistent record of brutality from the moment of its formation in 1996, including the massacres of civilians.

47.     According to Jhon Jairo Esquivel Cuadrado, alias "El Tigre," the commander of the Juan Andres Alvarez Front from 1996-2000, prior to November 1999, the Juan Andres Alvarez Front was operating in the municipalities of Bosconia, El Paso, La Jagua de Ibirico, Becerril, Agustín Codazzi, San Diego, La Paz, and Chiriguaná, which are the major towns in Cesar along the route of Drummond's rail line. As El Tigre stated, "the AUC was there because these were known FARC strongholds, and the AUC's mission was to eradicate the FARC wherever we found it." Exhibit 17 at ¶ 1 and Exhibit A thereto.

48.     El Tigre further stated that "I have reviewed the facts of what happened to those who were killed as described in Plaintiffs' Complaint in the *Balcero* case that was filed on May 19, 2009 (referenced in ¶ 3, *supra*). While many of those events occurred after I was captured by police on July 19, 2000 and taken out of service with the AUC, the places that are described are

areas that were FARC strongholds and that we had targeted for attack. The violent acts that are described are typical of what we in the AUC did to ensure that villagers would not provide any form of support to the FARC. While I was commander of the Juan Andres Alvarez Front we infiltrated the communities where the FARC had a presence, identified persons we suspected of being guerillas, and then hunted them down and killed them. We used brutal methods to ensure that the survivors would be clear that if they assisted the FARC in any way, a brutal death would be their fate. Drummond's support for our Front and the Northern Block did not change our military targets or methods, but did prioritize the order and timing of the areas we targeted, and of course, allowed us to be more effective because Drummond's funds provided us with more men, arms and supplies. Based on Drummond's direction to us, mainly provided through Alfredo Araujo, we prioritized our operations to have a major focus on the towns along Drummond's rail line where we had information that the FARC was operating or had supporters."  Exhibit 17 at ¶ 18.

49.      Alcides Manuel Mattos Tabares, alias "Samario", was, from mid-2000 until May, 2002, the chief of security for Oscar Jose Ospino Pacheco, alias "Tolemaida," who in July, 2000 replaced El Tigre as the Commander of the Juan Andres Alvarez Front. Samario was jailed from May-December, 2002, and when released, was made the third Commander of the Front and was in charge of "Urbanos," the AUC's term for hit men. Exhibit 18 at ¶ 4. As the person directly responsible for processing orders to execute people from December 2002 until April 9, 2005, when he again went to prison, Samario had full knowledge of the targets and the reasons for executions carried out by the AUC's Juan Andres Alvarez Front. Samario, consistent with the assertions of El Tigre, has stated that the Front focused a lot of its operations against the FARC in the areas around Drummond's rail line in Cesar, particularly in the municipalities of Bosconia, El Paso, La

Jagua de Ibirico, Becerril, Agustín Codazzi, San Diego, La Paz, and Chiriguaná. This was, according to Samario, "because the FARC was very successful in these areas and this is where we had to fight them and root out their supporters." *Id.* ¶¶ 4-5. Further, Samario stated that, "every execution order that passed through my hands was to kill someone we thought was a member or supporter of the FARC, or we thought was a leftist guerilla who was on the same side of the war as the FARC. Sometimes others were killed in villages when we went after our targets because they were in the way, or we needed to make a strong example to the people. Even the unionists we killed for Drummond we killed because Alfredo Araujo Castro, who had an important position with Drummond, told Tolemaida and me they were leftist guerillas who were helping the FARC." *Id.* ¶ 5.

50.    Samario confirmed that, following the successful executions of the union leaders, Drummond began regularly financing the Juan Andres Alvarez Front to exterminate the FARC in the areas along Drummond's rail line. As the head of the "urbanos" he was directly involved in most of the killings, and they ultimately drove the FARC away from Drummond's rail line. Samario provided a partial list of 250 names of the many people he killed in furtherance of Drummond's direction to cleanse the rail line areas of FARC and their sympathizers. *Id.* ¶¶ 16-18 and Exhibit A thereto.

51.    Early on, Araujo, acting as Drummond's primary contact with the AUC, had specific and detailed knowledge of the AUC's record of terror due to his discussions with Jorge 40, Tolemaida, and Jaime Blanco Maya, and other AUC leaders with whom he had a personal relationship.

52.    According to Jairo Jesus Charris Castro, who was until March 1999 the Security Coordinator for Viginorte, the private security company used by Drummond in Colombia that was

also a front group for the AUC, he regularly observed security meetings involving not only Adkins and Alfredo Araujo with General Peña and Colonel Lineros in 1998-99, but also Garry Drummond, Defendant Mike Tracy, and Defendant Augusto Jimenez, among others, participating in security briefings that included discussions of the activities of the AUC and the FARC as they related to Drummond's areas of operation in Colombia.

53.    Defendant Mike Tracy had his own contacts with AUC members. Between 1998-2000 he met with AUC representatives on several occasions at an apartment in Santa Marta that was in front of the Ecopetrol building. The apartment was on the 5th floor, and it was rented from a Colombian named Mauricio Avellaneda. He also met with AUC commanders at the Drummond port area. AUC members were given free access to the Drummond port and were waived through the security gates by Drummond Security forces. Defendant Tracy was often there and met with the AUC forces. Defendant Tracy also on numerous occasions had drinks with AUC members at a bar in Santa Marta called the Golden Mendihuaca Caribbean Resort. During these informal meetings, Defendant Tracy would receive briefings from the AUC on the status of their security operations for Drummond.

54.    After the AUC was designated a terrorist organization, at least some of Drummond's payments were made to ISA, the food service company that served as a conduit for AUC funding with the assistance of Alfredo Araujo's close friend, Jaime Blanco Maya. These funds were channeled to the AUC by Blanco. Drummond's payments to the AUC in cash and through front companies are direct evidence of Drummond's knowledge that it was paying for illegal activity. Drummond also, according to the Popa Battalion's commander Colonel Mejia, began channeling money to Colonel Mejia to distribute to the AUC as a way of hiding and legitimizing the payments.

**VI.    THE SPECIFIC WAR CRIMES THE DRUMMOND DEFENDANTS COMMITTED WITH THE AUC TO BENEFIT DRUMMOND'S BUSINESS INTERESTS IN COLOMBIA.**

55.    Shortly after the Drummond employees in Colombia successfully organized themselves into a union known as SINTRAMIENERGETICA, the Drummond Defendants decided to use the very paramilitaries which they helped establish as a force in the region to destroy this union.  In relevant part, key members of the Drummond Ltd. management – including Defendant Augusto Jimenez; Defendant Alfredo Araujo; Ricardo Urbina Aroca, Senior Human Resources supervisor; and Pedro Maya, Human Resources Manager at the La Loma mines – met with leaders of the AUC, including AUC Northern Bloc leader Jorge 40 and his representatives, during the latter part of 2000 and the beginning of 2001 to arrange for the AUC to eradicate the union through violent means.  In furtherance of this conspiracy, this management made payments to the AUC as consideration for the AUC's carrying out this violent destruction of the union, including the murders of Valmore Locarno Rodriquez ("Locarno"), Victor Hugo Orcasita Amaya ("Orcasita"), and Gustavo Soler Mora ("Soler"), who were the top union leaders and also employees of Drummond.

56.    Locarno and Orcasita, President and Vice President, respectively, of the union, had been in heated negotiations with Defendants for nearly a year for a new contract.  In the course of the ongoing negotiations, pamphlets were passed out on and around the Drummond Company facilities in Colombia labeling SINTRAMIENERGETICA a "guerilla union," and attacking Locarno and Orcasita as supporters of the guerillas.  In a letter to Drummond Ltd., Locarno specifically protested that the pamphlets described above had been distributed around the La Loma mine in the Cesar Department of Colombia.  He asked for security protection because of the death

threats he had been receiving. His request was denied by Drummond Ltd.'s Senior Human Resources supervisor, Ricardo Urbina Aroca, by letter dated October 6, 2000. In rejecting this request without explanation, Ricardo Urbina Aroca told Locarno, on behalf of Drummond Ltd., that "[w]e hope that the authorities can take measures that they consider appropriate regarding the situations raised by you all."

57.     There were two persistent issues that were the subject of heated negotiations between SINTRAMIENERGETICA and the Drummond Company. First, the union demanded better security to protect them from the paramilitaries who had been hired or retained by Defendants to protect the Drummond rail lines and other facilities from attacks by guerillas operating in the area. The other contentious issue was that in the prior year, several Drummond workers were killed in a mining accident, and the company had failed to pay the compensation due their families under the laws of Colombia. During these negotiations, the President of Drummond Ltd., Defendant Augusto Jimenez, made veiled threats against the union leaders, telling them on several occasions that "the fish dies from opening his mouth," according to several witnesses present.

58.     Locarno met personally with Defendant Garry Drummond on the worker compensation issue on or about June 12, 2000, in Colombia. Locarno and Orcasita had also written and faxed to Garry Drummond personally their concerns that their lives, and the lives of other union leaders and members, were in danger due to the presence of the violent paramilitary forces that were agents or employees of Defendants. They also specifically notified other officials of the Drummond Company and/or Drummond Ltd., including, but not limited to, Defendant Augusto Jimenez, D. L. Lobb, General Manager of Drummond Ltd., and Mike Zerbos, an employee of Drummond Company, Inc., about their security concerns.

59.    The concerns expressed by Locarno and Orcasita to Garry Drummond and other representatives of Defendants were based on recent assassinations, kidnappings and torture of other members and leaders of SINTRAMIENERGETICA.  In the year prior to the murders of Locarno and Orcasita, Candido Mendez and Manuel Enrique Charris Ariza were also murdered by the paramilitaries.  Locarno and Orcasita had made a very simple demand to be permitted to sleep at the coal mine, rather than being transported to nearby villages by bus, where they were exposed to the paramilitaries who controlled the local roads. This request, made to Garry Drummond and other Drummond officials, was denied despite the fact that Colombia's secret service agency, the DAS, had alerted Drummond that Locarno and Orcasita were at risk of assassination and despite the fact that the DAS itself echoed their request that they be able to sleep at the coal mine.

60.    Meanwhile, other agents of the DAS collaborated with the AUC paramilitaries, funneling money to these paramilitaries and actually encouraging them to kill unionists.  Indeed, at least one DAS official, Rafael Garcia, witnessed the payment of monies by a top Drummond official – an individual he believed to be then Drummond Ltd. President Augusto Jimenez but later realized that the person was Alfredo Araujo – to Jorge Castro Pacheco, a sitting Colombian Senator and a representative of the AUC Northern Bloc commander Jorge 40.  It was clear from what was said at this meeting that the exchange of money was in return for the AUC's agreement to carry out the killings of Valmore Locarno and Victor Orcasita.  Yet, the DAS did nothing to prevent these killings though it was officially tasked to protect unionists by the Colombian government.

61.    Although Defendants flatly refused to improve security arrangements for the union leaders who had received specific death threats, Defendants made sure that the expatriate employees from the U.S. were never exposed to danger.  At all times material hereto, these U.S. employees were flown in and out of the Drummond mines and port on a private runway and

provided with a compound where they lived and were protected by the military and private security forces 24 hours a day, 7 days a week.  At all times relevant hereto, Drummond's private security forces, which guard both its operations and U.S. personnel, have themselves been led by active and former military personnel, including General Pena (chief of security for both the port and mines), Retired Colonel Jorge Garzón (chief of Security for the port) and Retired Colonel Edgar Ruíz.

62.     On March 12, 2001, shortly after they were threatened by Defendant Augusto Jimenez, Locarno and Orcasita were pulled off a Drummond company bus and murdered by paramilitaries of the AUC.  Some of these paramilitaries were themselves members of the regular military and were on the military's payroll while they also assassinated innocent civilians. The paramilitaries who killed Locarno and Orcasita were working as agents or employees of Defendants at the time.

63.     The paramilitaries boarded the bus and asked for Locarno and Orcasita by name, saying that these two "had a problem with Drummond."  The paramilitaries made the workers produce their identification cards.  When Locarno was identified by the paramilitaries, he was pulled off the bus and shot in the head several times in front of the other workers.  Orcasita was then identified.  He was tied up and thrown in the paramilitaries' vehicle.  He was found dead by the side of the road several hours later, shot in the head.  He had been tortured before he was murdered.  There were cuts on his chest, and his teeth had been knocked out.  Both because some of the regular military in the area were involved in the executions as members of the paramilitaries, and because the regular military stationed at the Drummond compound allowed the paramilitaries to operate with impunity, no action was taken by the military to bring those responsible for the murders of Locarno and Orcasita to justice.

64.     Subsequent to the murders of Locarno and Orcasita, their families received written and verbal threats to keep quiet about the murders.

65.     Soler eventually stepped up to assume the position of President of the Union.  He renewed negotiations with Drummond and specifically sought to obtain new security arrangements for the workers, especially in light of the murder of Locarno and Orcasita. He and the other leaders of SINTRAMIENERGETICA sent a letter to Garry Drummond renewing the demand to allow the workers to have sleeping facilities at the mine site.  Again, this request was denied.  In addition, Soler publicly denounced the murders of Locarno and Orcasita and publicly stated his belief that someone at the La Loma mines must have told the paramilitaries which specific bus was carrying them on the night of March 12, 2001.  Meanwhile, threats against Soler's life and the lives of other union leaders continued.

66.     On October 5, 2001, shortly after assuming the position of President of the Union, Soler himself was murdered by paramilitaries of the AUC. Soler was captured by paramilitaries on his way back home from the La Loma mines, just as Locarno and Orcasita had been. Thus, after leaving work at around 2:30 in the afternoon, Soler was left by the escorts he was using for security at the transport terminal near the mines in the city of Valledupar.  He then boarded a public bus traveling toward his home town of Chiriguana. While in transit, the bus he was on was stopped by paramilitaries which drove in the path of the bus with a white truck and parked the truck in front of the bus.  The paramilitaries boarded the bus and called Soler by name.  They then removed him from the bus.  On October 7, the body of Soler was found in a nearby area by farmers.  His body showed signs of torture and he had been shot twice in the head.

67.     Jaime Blanco Maya and Jairo Jesus Charris Castro have both been convicted by the Colombian courts for their roles in the murders of Locarno and Oracasita. Both of them have

admitted that they participated in the conspiracy to murder the union leaders, but that it was Adkins, Araujo, Garry Drummond and others from Drummond who were the "intellectual authors" of the murders. In both cases, the judges issued a final sentencing report directing prosecutors to investigate the role of these Drummond officials in the murders. As one key example of the Drummond Defendants ability to bribe and threaten their way to legal impunity for human rights crimes in Colombia, the presiding judge, in the criminal trials for Charris and Blanco, William Andrés Castiblanco Castellanos, specifically ordered prosecutors to investigate the role of Drummond officials in the murder of the union leaders based on the strong evidence presented at the trials of Drummond's financing of the AUC. No serious investigation was ever conducted by those prosecutors.

68.     To this day, SINTRAMIENERGETICA is hobbled and haunted by the murders of its top leaders by the AUC at the direction of the Drummond Defendants. Drummond had the union leaders murdered precisely to cripple the union to prevent it from pursuing effective contracts, which would increase labor costs for Drummond.

69.     Drummond directed the AUC to protect its mine, its rail line and its port, at all costs. It was essential for Drummond to comply with its contractual obligations to supply coal to its customers under the deadlines set by the contracts. If FARC or other guerilla groups were able to attack any of Drummond's facilities, they would cause costly delays to Drummond's operations. Based on the statements of El Tigre and Samario, as well as other AUC leaders who have testified in the J&P process in Colombia or have otherwise given statements, all of the people killed by the AUC in the area of Drummond's facilities were executed as suspected FARC members or supporters. Neither Drummond nor the AUC went to much trouble to verify whether someone who they "suspected" as being associated with FARC actually was. Instead, it was more efficient to

simply "cleanse" the local population of anyone who could remotely be conceived to have been a supporter of the FARC. As a result, hundreds, if not thousands, of innocent civilians were murdered by Drummond's AUC death squads simply for being in the wrong place at the wrong time. The Drummond Defendants were willing to directly support and direct this murderous operation because they put the financial interests of the coal operations above the lives of the rural farmers who lived in the area. Drummond was able to use its corrupt political influence, along with threats and other violence, to avoid accountability for the thousands of deaths that resulted from Drummond's use of the AUC as a security force.

70. The decedents in the several human rights cases described in paragraph 3, *supra*, are all innocent victims of the Drummond plan to substantially assist the AUC in its scorched earth security program. These and many other people were executed by the AUC in furtherance of the Drummond Defendants' business interests.

### VII. THE DRUMMOND DEFENDANTS USED THREATS AND BRIBES TO TRY TO SILENCE KEY WITNESSES OF THEIR  ILLEGAL COLLABORATION WITH THE AUC.

71. Plaintiffs Collingsworth and Otero, along with other lawyers working with them, faced significant challenges in proving that Drummond had provided substantial assistance to the AUC that resulted in war crimes and other violations of international law. The obvious initial challenge was that in the late 1990's and early 2000's, when Drummond and the AUC were engaged in their most brazen and violent acts, Colombia was a very dangerous place for human rights activists to work. Indeed, Drummond was not only directing and supporting a murderous rampage with the AUC, the Drummond Defendants hired persons with clear records of illegal activity to key "security" positions.

72.     In addition to hiring Jim Adkins as director of security after he was fired by the CIA for his illegal conduct in the Iran-Contra plot, Drummond hired Colombian Lieutenant Colonel Julian Villate Leal to be the director of security at "Puerto Drummond." Private security companies and members of the Colombian military had launched a program called "Operation Dragon," which targeted human rights activists for execution. According to a report by the Robert F. Kennedy Center for Justice and Human Rights, an August 2004 investigation revealed that Operation Dragon targeted "over 175 union leaders, human rights workers and members of the political opposition." *See* Exhibit 19 at 1. Villate was the head of Operation Dragon. *Id*. A raid on his home uncovered documents indicating he had possession of the security plans provided to the targeted human rights activists in the witness protection plans established by the government of Colombia. The government agencies that were supposed to be protecting these witnesses were aware of Operation Dragon. *Id.* at 1-2. Several of the union leaders on the Operation Dragon hit list were threatened by AUC members and were referred to as "Indumiles." *Id.* at 2. In Lt. Col. Villate's papers seized in the raid, he too referred to the targeted individuals as "Indumiles," a shortening of the term "Industria Militar,"meaning military suppliers to the FARC. *Id.*

73.     After the public scandal over the exposure of Operation Dragon and Lt. Col. Villate's role therein, he was hired briefly by the U.S. Embassy in Bogotá to perform security work. After a brief stint at the U.S. Embassy, on July 9, 2005, Lt. Col. Villate was hired by Drummond to be the security coordinator for Drummond's port in Colombia. Drummond was aware of the allegations of Lt. Col. Villate's participation in Operation Dragon when the company hired him. Once a formal process began in 2011 to charge him for his participation in Operation Dragon, as per the operation of law in Colombia, Lt. Col. Villate's contract with Drummond was suspended.

74.     Numerous other former members of the military with records of violence against human rights activists were hired by Drummond in key security positions. Most of these former military personnel also had a record of working closely with the AUC. Drummond essentially had a private army to intimidate and threaten with violence any person who attempted to expose Drummond's role in funding war crimes for the purpose of protecting the company's bottom line.

75.     Drummond also had an army of corrupt and politically-connected advisors to ensure that the Drummond Defendants enjoyed legal impunity for their systematic violations of international law in pursuit of profits. Among others, Drummond had former president Alvaro Uribe's chief of staff, Fabio Echeverri, now deceased, on a retainer since the late 1980's and paid him $100,000 or more each year until he died in 2017. In a deposition of him taken by Plaintiff Collingsworth, Echeverri claimed to be unable to explain what he did for $100,000 or more each year except that he gave Drummond "advice."

76.     One thing Echeverri did do for Drummond to earn his annual retainer was to use his dual positions as Chief of Staff for President Uribe and chair of EcoPetrol, the oil company owned by the Colombian government, to unlawfully seize extremely valuable oil rights owned by Llanos oil, Plaintiff van Bilderbeek's company, and transfer those rights to Drummond. The process under which Echeverri transferred the oil rights to Drummond was in blatant violation of Colombian law and procedure, but since he had a direct line to President Uribe, Drummond was able to receive this unlawful prize with no objection from the Colombian government. There is no question that on many occasions Echeverri used his influence with Uribe and the Colombian government to obtain valuable favors for Drummond and keep the Drummond Defendants safe from government prosecutors.

77.     Drummond also retained the services of Defendant Jaime Bernal Cuellar as their chief outside counsel in Colombia. Bernal was the Colombian Attorney General from 1997-2001 and aggressively ignored crimes committed by Drummond and other multinationals in collaboration with the AUC. When Bernal returned to private practice, Drummond put him on retainer, and Bernal used his influence with subsequent government prosecutors to keep the Drummond Defendants free from legal scrutiny.  When Bernal's former law partner and protégé, Luis Eduardo Montealegre Lynett, served as the Colombian Attorney General from 2012-16, this coincided with the period when the results of the J&P process revealed strong links between Drummond and other multinationals and war crimes committed by the AUC. Efforts by lower level prosecutors to hold Drummond accountable went nowhere as Bernal's influence with Montealegre was well known. Several lower level prosecutors told Plaintiff Collingsworth in confidence that Drummond was immune from prosecution due to Bernal's influence with Montealegre.

78.     In one example, Prosecutor 118, Adriana Eslava, was twice ordered by a Colombian judge to open an investigation of the role of the Drummond Defendants in the murder of the three Drummond union leaders. The first time was after the conviction of Charris for his role in the murders and the trial judge in that case found that there was sufficient evidence from the Charris trial to investigate the Drummond Defendants. The second time was after the conviction of Jaime Blanco Maya for his participation in the murders of the union leaders. Frustrated with the lack of action by the prosecutor after the Charris conviction, in the sentencing report following the conviction of Blanco, the trial judge, William Andrés Castiblanco Castellanos, ordered that, to the extent the prosecutor still had not done so, to investigate the role played in the murder of the union leaders by Garry Drummond, Jim Adkins, Augusto Jimenez, Alfredo Araujo, Luis Carlos

Rodriguez, Rafael Garcia, Jorge Castro Pacheco "and others named in these proceedings." Exhibit 20 at 1. In neither case did Ms. Eslava conduct a serious investigation. Instead, she cooperated with Defendant Bernal to suppress evidence and protect Drummond from prosecution.

79.     Prosecutor Eslava went so far as to visit AUC member Peinado with a lawyer sent by Defendant Bernal and threatened him with serious consequences if he testified about Drummond. She visited another important witness with Bernal, Edwin Blanco, and was present when Bernal offered him a house to keep quiet. Ultimately, working with Bernal, Prosecutor Eslava concocted a plan to charge Defendant Araujo with the murder of the Drummond union leaders, and then quickly concluded there was not sufficient evidence and dismissed the charges. Defendant Bernal, with help from Drummond's U.S. counsel, ghost wrote most, if not all, of the decision to dismiss the charges, and in reaching that conclusion, relied on Drummond's false accusation that Plaintiffs bribed the witnesses who gave evidence against Drummond. In allowing the charges to be brought and then dismissed against Araujo, Bernal was seeking to immunize Araujo against further prosecution based on double jeopardy rules. Bernal had previously worked with Jaime Blanco Maya and Drummond Ltd.'s current President, Jose Miguel Linares, to cover up evidence of Drummond officials' participation with Blanco in the murder of the Drummond union leaders. Blanco has since testified that Bernal knew about Drummond's payments to the AUC and worked with Blanco to cover those up and prevent any prosecution of Drummond officials and Blanco. However, at some point, Drummond decided to scapegoat Blanco and blame him for the murders.

80.     In another example, Prosecutor No. 12, Claudia Suarez Cuando, began a serious investigation into the role of the Drummond Defendants in the murders of the Drummond union leaders, but Defendant Bernal again intervened with his friends in high places. Ms. Suarez was

fired from her position as a prosecutor. Her appeal of that wrongful termination is pending in Colombia.

81.     Bernal also participated directly in meeting with potential witnesses to Drummond's collaboration with the AUC and repeatedly advised them that it would be dangerous to testify to Drummond's relationship to the AUC.

82.     Knowing that they enjoyed strong protection in Colombia, Drummond was able to silence witnesses using brutal methods. For example, attached hereto as Exhibit 21 is the May 13, 2004 Declaration of Jimmy Rubio. He was an employee of the Drummond mine in Colombia and was active in the union there, SINTRAMIENERGETICA. *Id*. ¶ 2. He rose to the position of Secretary of Education. *Id*. ¶ 3. His sister was killed by the AUC in 2002. *Id.* AUC Commander Tolemaida then was about to kill him because he was on a hit list, but a Colombian military officer intervened. *Id*. ¶ 4. Mr. Rubio then sought out the regional head of the AUC, Alexander Pianeta Vargas, to find out why he and other members of his family were on the list, at which point Vargas agreed to take them off the list. *Id*. ¶ 5. Mr. Rubio knew where to find Commander Vargas, and he often saw him on Drummond property collecting fuel and supplies. Vargas told Rubio that he had permission "from above" to use the Drummond facilities. *Id*. ¶ 6.

83.     A few weeks before the union leaders Locarno and Orcasita were murdered, Mr. Rubio saw Vargas coming out of the offices of Drummond's Director of Community Relations, Defendant Alfredo Araujo, in Valledupar. Commander Vargas told him that he was picking up his monthly quota from Araujo, and he showed Mr. Rubio two checks made out to Vargas and signed by Araujo. *Id.* Vargas also told Mr. Rubio that Araujo and his family had set up the AUC in the region. *Id.*

84.     A few days before the murder of the union leaders, Mr. Rubio ran into Vargas and another AUC leader, Nicolas Capitolino, who boasted about killing union leaders from the oil workers' union. Vargas then said there was going to be another big operation. *Id*. ¶ 7. After the union leaders were murdered, Capitolino boasted to Mr. Rubio that he had participated in the murders, and that someone from inside Drummond had assisted in identifying the bus that Locarno and Orcasita were on to aid the assassination. Capitolino showed Mr. Rubio Locarno's gun, which he took from him after he was murdered. *Id*. ¶ 8.

85.     Mr. Rubio personally told Plaintiff Collingsworth he would testify to all of the facts in his declaration and would add details regarding other AUC leaders and members he had seen at Drummond's facilities. By this time, Mr. Rubio had fled for his life because, as he told Plaintiff Collingsworth, he "knew too much about Drummond and the AUC." He was living in Venezuela with his wife in a small town near the Colombian border. On March 18, 2005, a few days before Mr. Rubio was to be deposed in the *Romero* v *Drummond* case, his father-in-law, who still lived in Colombia, was murdered. *See* April 1, 2005 Declaration of Jimmy Rubio, attached hereto as Exhibit 22, ¶ 5. According to Mr. Rubio, "my father-in-law's tongue was cut out when he was murdered – a sign that he was killed because he, or others close to him, such as myself, was speaking out against the paramilitaries. ***I have no doubt that this gruesome murder occurred so that I did not testify in this case***." *Id.* (emphasis added).

86.     Following this retaliatory murder of Mr. Rubio's father-in-law, he disappeared and Plaintiffs we were unable to obtain his testimony for trial. Plaintiff Collingsworth later found him again in a remote area of Venezuela, well after the *Romero v. Drummond* trial was over in July 2007. He told Plaintiff Collingsworth that his wife, whose father had been murdered, refused to let him testify and risk his life, so they disappeared.

87. In another example of Drummond orchestrating threats against witnesses, Carmen Josefa Amaya Daza, a plaintiff represented by Collingsworth and named as Jane Doe VI in *Romero v. Drummond*, received threatening phone calls after being deposed by Drummond on April 7, 2005 about the murder of her son, Victor Orcasita, one of the Drummond union leaders discussed above. She received these calls on May 8 and 9, 2005. *See* Declaration of Carmen Josefa Amaya Daza, attached hereto as Exhibit 23, ¶ 2. Shortly thereafter, on May 17, 2005, she received a threat from the AUC written inside a sympathy card. It stated, "because you are a snitch, talking and complaining to the gringos, what's going to happen to you is the same thing that happened to your son, you are going to have to leave town, this is serious, because we don't mess around." *Id.* ¶ 2 and attachment thereto.

88. These threats extended to Plaintiff Collingsworth personally. Attached hereto as Exhibit 24 is the original Spanish and an English translation of a full-page ad Drummond placed in several important newspapers in Colombia, including *El Tiempo*, attacking Plaintiff Collingsworth personally with false assertions about his intentions to cause economic damage to the Colombian economy. This ad put Collingsworth's life in danger, as it used the same coded language that the paramilitaries used when targeting leftist guerillas by accusing them of damaging business interests. During the first *Drummond* trial, numerous witnesses testified that when Drummond managers called a union leader a "guerilla" or "leftist", this was the equivalent of alerting the AUC that the person was targeted for assassination. When Drummond published the ad attacking Plaintiff Collingsworth, his colleague in Colombia, Francisco Ramirez, was alarmed and reminded him that this was the same tactic Drummond had used to attack the union leaders before they were murdered. He advised Collingsworth not to travel to Colombia for a while to let the situation calm down.

89.     Plaintiff Ivan Otero has been receiving serious death threats since he started working with Plaintiff Collingsworth on the Drummond cases. In addition to receiving numerous death threats against him and his family, he has survived multiple assassination attempts. His declaration detailing the facts of these threats and his security concerns is attached hereto as Exhibit 25.

90.     Plaintiff Collingsworth promised to any witness in the *Balcero* case that if they testified and they or a family member received a credible death threat, his legal team would do whatever they legally and ethically could to provide security or to provide a safe haven until such time as the danger had subsided. He explained to them that in the United States, in a similar situation, when prosecutors pursue Mafia figures, the people willing to testify against them are in grave danger, and the prosecutors often put the witnesses in witness protection programs to keep them alive. Unfortunately, virtually all of the witnesses who had given statements against Drummond and were about to testify received threats against themselves or their family members. If a witness received a more general threat, Collingsworth would discuss it with them and they would agree to be vigilant, and the witness agreed to notify him immediately if there was any further threat. Others took their own security precautions by, for example, relocating to a relative's home in another area of Colombia. If there was a credible death threat against a witness or a family member, Collingsworth considered it his legal and ethical duty to take what steps he could to keep that person safe.

91.     The Drummond Defendants falsely accused Plaintiff Collingsworth of bribing witnesses in the *Balcero* case. In doing so, the Drummond Defendants and their lawyers knew that Mr. Collingsworth had provided security protection to threatened witnesses and that this was legally and ethically permissible. In support of his position, Plaintiff Collingsworth and his legal

team retained three top experts to evaluate the security assistance Mr. Collingsworth provided to relocate the family members of any witnesses. They jointly concluded that the way that he did it was necessary, legal, ethical, and morally-required.

92.    The first expert, Javier F. Peña, was a Special Agent for the U.S. Drug Enforcement Administration ("DEA").   In his expert report, Mr. Peña described his experience working in Colombia in pursuit of Pablo Escobar and the Medellin Cartel. Exhibit 26 ¶¶ 3-5. He describes how dangerous it is in Colombia to testify against these violent groups, such as the AUC, and notes that the custom of these groups is to offer "bribes or bullets" to keep people quiet. *Id.* ¶¶ 11-12; 18-22. A basic step the DEA takes to protect witnesses is to move them and their families to a new city and provide reasonable living costs. *Id.* ¶¶ 24-26. He states that the DEA has "a moral and ethical obligation to provide support to confidential witnesses until the threat has passed." *Id.* ¶ 27. Finally, he notes that in his experience with the DEA in Colombia, witnesses will not tell the complete truth until they and their families are safe. *Id.* ¶¶ 29-30.

93.    The second expert, Stephen J. T'Kach, worked at the U.S. Department of Justice for 22 years, and was the director of its Witness Security Program. Exhibit 27 ¶¶ 3-6. He stated that in his experience, relocating witnesses and their families for security was essential to obtain testimony involving criminal actors, and this is especially true in the dangerous environment of Colombia. *Id.* ¶¶ 8-11. Neither Mr. T'Kach nor the Department of Justice viewed the security relocation support as a "benefit" to the witnesses or their families as this did not even make them whole for the risks taken in testifying against criminal agents. *Id.* ¶ 9. If a witness or a family received death threats or was in danger, the Department of Justice required as part of the witness protection program that their families be relocated and fully supported for as long as the danger persisted, including after the testimony was provided. *Id.* ¶¶ 18-34. Mr. T'Kach considered it his

moral obligation to err on the side of providing the fullest support and protection. *Id*. ¶ 34. His experience in Colombia was that it was significantly more dangerous for witnesses to testify against violent groups than in the U.S. *Id*. ¶¶ 38-40.

94.     The third expert regarding the propriety of protecting the family members of witnesses was Professor Charles W. Wolfram, who is the Charles Frank Reavis Sr. Professor Emeritus at Cornell Law School. He has spent most of his career specializing in legal ethics. Exhibit 28 ¶¶ 5-6. He is the author of the leading textbook on legal ethics and was the reporter for the American Law Institute's *Restatement of the Law Governing Lawyers*. *Id*. ¶ 6. Professor Wolfram stated in his expert report his conclusion that providing security to the family members of witnesses in the Drummond case was entirely ethical. *See, e.g.*, *id*. ¶¶ 14-16; 22-24,28.

95.     Drummond did not provide any expert testimony to rebut the unassailable positions of these three experts. Nonetheless, the Drummond Defendants and their counsel persist in stating falsely that Mr. Collingsworth and his colleagues bribed the witnesses they were instead protecting. Drummond knows the details of the witness protection provided by Mr. Collingsworth because he and his legal team disclosed it during discovery. Plaintiff Collingsworth arranged to provide security for the family members of witnesses who had a legitimate fear of violent retaliation. Plaintiff disclosed to Drummond in discovery of the *Balcero* human rights case documents regarding funds for security he arranged to provide for Jesus Charris Castro, Libardo Duarte, and Jose Gelvez Albarracin, all witnesses in the *Balcero* case.

96.     In the case of Jairo Jesus Charris Castro, he first provided a declaration in roughly June 2009 detailing Drummond's connections to the AUC. Attached hereto as Exhibit 29 is this first handwritten declaration provided by Charris. Prior to providing this declaration, Charris' testimony was taken on several occasions by Colombian authorities. On May 7, 2009, Charris

testified that the murders of Drummond union leaders Orcasita and Locarno were planned by Drummond executives. *See* Relevant Excerpts of May 7, 2009 Testimony of Jairo Jesus Charris, attached hereto as Exhibit 30, at DRUM0000016-17. Charris also testified in this hearing that he had not disclosed these details in the previous two statements taken shortly after his arrest because he was concerned for his family's safety, as they still lived in La Loma, Cesar, which is near the Drummond mine. *Id.* at DRUM0000036. It is worth noting that under Colombian law against self-incrimination, witnesses are not required to remain silent in order to protect themselves under the law against self-incrimination, as they are in the United States. Under Colombian law, witnesses are no longer testifying under penalty of perjury – in other words, they are allowed to lie – when testifying about their own participation in criminal acts, as "[t]he oath . . . will not have negative penal effects insofar as the testimony refers to his own conduct." Attached hereto as Exhibit 31 is a true and correct copy of an excerpt of the July 28, 2005 decision by the Colombian Constitutional Court confirming this legal principle.

97.     Charris again detailed Drummond's connections to the AUC and Drummond executives' roles in the murders of the union leaders in June 2009 at a hearing before Colombian authorities. *See* Relevant Excerpts of June 23, 2009 Letters Rogatory Testimony of Jairo Jesus Charris Castro, the original Spanish and an English translation of which is attached hereto as Exhibit 32, at DRUM00000470. In this hearing, Charris also expressed concern for his family's safety, since they still lived in La Loma, and he was worried that Drummond would retaliate against them because of his testimony against Drummond. *Id.* at DRUM00000491. In July 2009, several months after Charris had begun providing Plaintiff Collingsworth and his team and the Colombian authorities with evidence of Drummond's role in the murder of the Drummond union leaders, Collingsworth made the decision to move Charris' family out of La Loma, as their lives

were in grave danger because Charris was providing important evidence against Drummond. Collingsworth authorized the wire of 3,000,000 Colombian pesos (COP) (roughly $1,500 USD) to cover their moving costs on July 30, 2009. Charris finalized his declaration detailing Drummond's links to the AUC on roughly September 2, 2009, attached hereto as Exhibit 33. In this declaration, he stated:

> Finally, I must state my fear, because while some members of the AUC are in jail giving testimony under the Justice and Peace Process, the majority of AUC members continue to operate and present great danger for the people who are talking. For example, I myself moved my family from Cesar to a safer place because I am sure they would be harmed because I am giving this declaration. Drummond officials and AUC members are still free. *Id.* ¶ 17.

98.     Starting on September 21, 2009, Collingsworth authorized a monthly wire to Charris' family in order to keep them in a safe haven, since their lives were still at great risk because of the information Charris was providing about Drummond's connections to the AUC.

99.     Despite the security measures that were taken to keep Charris' family safe, Charris himself continues to live under high risk of assassination. In 2011, just before he was to give testimony in the *Balcero* case, Charris was transferred to a high security prison because of the high risk of an assassination attempt against him. When his testimony was finally taken in the *Balcero* case in May 2012, Charris wore a bulletproof vest due to the security threat, as required by Colombian prison officials. *See* Relevant Excerpts of May 2012 Deposition of Jairo Charris Castro, attached hereto as Exhibit 34, at 11:13-12:6. Additionally, Charris testified:

> I have been in danger from the time I've started clarifying the facts as to the death of the union members. For this reason . . . Drummond headed by Mr. Garry Drummond and Mr. Adkins would not really rest until they would put me down inside or outside the jail, and this danger would be extended to my family members as well because there are too many powerful people such as Drummond in general and a former commander of the AUC, Oscar Jose Ospino Pacheco, alias Tolemaida . . . .

*Id*. at 12:15-13:7.

100.    All security measures Plaintiff Collingsworth undertook to protect Charris' family were taken because of the mortal danger they faced as a result of Charris providing Collingsworth and his legal team with information about Drummond's criminal relationship with the AUC. Even before his arrest, long before he met anyone from Collingsworth's legal team, in July 2008, Charris acknowledged Drummond's links to the AUC in an April 2, 2008 email he sent to Drummond Ltd. President, Defendant Augusto Jimenez, stating that "the multinational Drummond was the one that ordered the job on the 3 union leaders," and that Jim Adkins had told Charris that the murder of the Drummond union leaders "was authorized by Mr. Gary Drummond, Augusto Jiménez, Alfredo Araujo, General Peña Rios and Colonel Luis Carlos Rodriguez." Attached hereto as Exhibit 35 is a true and correct copy of this April 2, 2008 email. Charris also stated in his email, "I am a witness to all the coordinations between the company Drummond and the AUC." *Id*. The fundamental essence of Charris' testimony expressed in this April 2, 2008 email has not changed to this day. The assertions by the Drummond Defendants and their counsel that Charris changed his testimony once his family received security payments from Plaintiff Collingsworth are knowingly false.

101.    Around December 2010, *Balcero* witness Libardo Duarte provided an interview to renowned Colombian journalist, Gonzalo Guillen, in which he detailed links between Drummond and the AUC, which occurred before Plaintiff Collingsworth or anyone on his legal team met or communicated with him. *See Demobilized Paramilitary Links Drummond to Paramilitaries*, *Noticias Uno*, Dec. 13, 2010, attached hereto as Exhibit 36.   After Mr. Guillen put Mr. Collingsworth in contact with Duarte, he provided him with a signed declaration on February 27, 2011, detailing how Drummond paid the AUC during the civil conflict to commit extrajudicial killings. Exhibit 37. It was not until after Duarte's family was threatened and forced to flee from

their home that Plaintiff Collingsworth took measures to keep them safe. Duarte's family was first threatened in March 2011, shortly after Duarte's declaration was produced to Drummond in the *Balcero* case on March 4, 2011. Shortly after Drummond learned of Duarte's testimony, Duarte's domestic partner and two youngest children were threatened by two men on the street, who told his family they would be killed if Duarte failed to "stop talking to the *gringos*." *See* Apr. 6, 2011 Declaration of Libardo Duarte, attached hereto as Exhibit 38, ¶¶ 5-6. A few days after they were threatened on the street, shots were fired at the home of Duarte's family, and they were forced to flee out of fear for their safety, leaving behind their home, jobs and the schools attended by Duarte's children. *Id.* ¶¶ 7-11. Two wires of $2,500 each were sent to Duarte's family so they could relocate to an undisclosed, safe location in late April 2011.  Documentation of these wires was produced to Drummond as part of the discovery process in the *Balcero* case. Duarte's Letters Rogatory testimony was taken on April 16 and May 23, 2012, and in all material respects, he confirmed the testimony he had provided in his February 27, 2011 declaration. The assertions by the Drummond Defendants and their counsel that Duarte changed his testimony once his family received security payments from Plaintiff Collingsworth are knowingly false.

102.    The journalist who originally interviewed Duarte, Gonzalo Guillen, has received several threats due to his work uncovering the crimes of politicians, companies, and other powerful individuals in Colombia. He was forced to flee Colombia after receiving death threats, and after the Colombian Ministry of the Interior revealed that it "had 'very precise and sensitive' information about a plan to murder Guillen and [additional journalists], who had exposed the connections of [Governor] Jose Francisco 'Kiko' Gomez Cercha with paramilitaries." *Colombian Journalist Leaves Country Due to Threats*, Global Post, Oct. 17, 2013, a true and correct copy of which is attached hereto as Exhibit 39.

103.    *Balcero* witness Jose Gelvez Albarracin's family was also forced to flee after receiving threats when Gelvez began talks with Plaintiff Collingsworth's legal team regarding links between Drummond and the AUC. Gelvez's family was forced to flee after he first provided Plaintiff Collingsworth with a statement detailing Drummond's relationship with the AUC on February 25, 2011, attached hereto as Exhibit 40. Attached hereto as Exhibit 41 is an undated draft declaration of Gelvez in which he expressed concerns for his family. He wrote, "And as you know, these mining companies continue operating in Colombia and still have much power in this country, and the most sensitive issues are left unpunished. It is no secret that these people will not hesitate to eliminate me or my family for giving this declaration." It was not until nearly a year after Gelvez first provided details about Drummond's relationship with the AUC that a single transfer of $2,084 USD was sent to Gelvez's wife, Celina Lombardi Nieves, on November 28, 2011, to cover the costs of her and their children's forced move. Plaintiff Collingsworth produced this documentation to Drummond as part of the discovery in the *Balcero* case. Gelvez's Letters Rogatory testimony was taken on March 16 and April 20, 2012, and in all material respects, he confirmed the testimony he had provided in his February 25, 2011 declaration. The assertions by the Drummond Defendants and their counsel that Gelvez changed his testimony once his family received security payments from Plaintiff Collingsworth are knowingly false.

104.    As described in the preceding paragraphs, Plaintiff Collingsworth fully disclosed to Drummond during the *Balcero* discovery process security payments he personally arranged to be made to Charris, Durate and Gelvis, all witnesses in that case. Other security payments were made by Plaintiff Collingsworth's legal team to protect family members of Alcides Mattos Tabares ("Samario") and Jhon Jairo Esquivel Cuadrado ("El Tigre"). Plaintiff Collingsworth had arranged for the law firm he was partnered with at the time, Conrad & Scherer LLP, to provide Plaintiff

Ivan Otero with approximately U.S. $5,000 per month for overall security issues and his miscellaneous expenses involved in working on the Drummond cases. Plaintiff Collingsworth understood that Mr. Otero was going to use some of the funds for his own personal security as he had been the target of assassination attempts and regular threats against him and his family members once he became a part of the legal team seeking to bring Drummond to justice. Mr. Otero had the discretion to provide family members of witnesses with security assistance as well. Mr. Otero arranged to relocate the family members of Samario and El Tigre. Plaintiff Otero did not convey the details of his security plans for himself, Samario or El Tigre to Plaintiff Collingsworth or anyone else. Plaintiff Collingsworth did at one point know that some of the security funds sent to Plaintiff Otero were being used for the security of family members of Samario and El Tigre, but as he did not know the details and was not directly involved in setting up their security arrangements, and as he had other legal and financial details to manage in the *Balcero* and other cases, he later did not recall that Otero was partially utilizing the security funds provided him for the families of Samario and El Tigre.

105.    When asked by Drummond in the discovery process of the *Balcero* case to disclose any payments made to witnesses or their family members for any purpose, Plaintiff Collingsworth disclosed payments for the family members of Charris, Durate and Gelvis, those he was directly involved in on a monthly basis, but did not disclose Otero's payments to the families of Samario and El Tigre because he only recalled that the security assistance was for Plaintiff Otero and never knew the details of any security arrangements for Samario and El Tigre. He repeated this error on several occasions in response to other discovery and in response to an inquiry by the Court in the Drummond libel case.

106.     Contrary to Drummond's false accusations, Plaintiff Collingsworth had no reason not to disclose legitimate security assistance to the families of Samario and El Tigre when he had disclosed similar assistance to Charris, Durate and Gelvis. Plaintiff Collingsworth knew that such assistance was legal, ethical and morally required, a position strongly reinforced by the expert reports discussed in paragraphs 92-94, *supra*. This was an inadvertent disclosure error that does not undermine the credibility of the testimony of Samario and El Tigre. In fact, that they were willing to testify at great personal risk demonstrates their commitment to the J&P process. Collingsworth admitted his error and his lawyers in the libel case fully corrected the record and provided the specifics of the security assistance provided to Samario and El Tigre.

107.     Jaime Blanco had a different security issue: while he was awaiting trial, he had insisted that he was innocent and had no role in the murders of Locarno and Orcasita. However, the evidence against him was very strong, including detailed testimony from Charris. Blanco met with Plaintiffs Collingsworth and Otero to tell them his story. He admitted his role in planning the murders of Locarno and Orcasita, but insisted that the Drummond Defendants were the "intellectual authors" of the murders. He told Otero and Collingsworth that he would be willing to tell the whole story about Drummond's role and admit to being just a conspirator rather than the mastermind of the murders, but said he would need assistance with attorney's fees because he was risking that his admission could get him convicted of being the "intellectual author" rather than a mere conspirator, which carried a much heavier prison term.

108.     Plaintiff Collingsworth discussed the issue with his colleagues and there was agreement that it would be ethical to provide Blanco with assistance for his attorneys fees to allow him to change his plea and tell the truth about his role with Drummond in the murders, but no

member of the legal team was willing or able to provide the approximately U.S. $100,000 that Blanco needed for his counsel.

109.    Plaintiff Collingsworth discussed the situation with Blanco again, who was adamant that he would be better off continuing to plead innocence to the charges than pleading guilty to the lesser crime of conspiracy without proper legal representation to prevent him from being convicted of the more serious crime of being the intellectual author of the murders.

110.    Plaintiff Collingsworth proposed to Blanco that Plaintiff van Bilderbeek would be willing to help him with his attorney's fees if Blanco would use his extensive political connections to gather information about the process under which Drummond managed to acquire Llanos Oil's exploration rights that were unlawfully seized by the Colombian government. Blanco agreed that this was acceptable, and Plaintiff Collingsworth introduced him to Plaintiff van Bilderbeek.

111.    Blanco conducted the investigation from prison and provided extensive information across several months. Plaintiff van Bilderbeek provided Blanco with approximately $100,000 for his attorney. Blanco then changed his plea and pled guilty to the crime of conspiring to murder Locarno and Orcasita. Free now to tell the entire story, Blanco provided a detailed declaration, Exhibit 42, of his arrangement with Drummond to funnel money to the AUC. He also testified in his criminal case and in the *Balcero* case. The judge in Blanco's criminal case found his Drummond testimony credible and ordered in the final sentencing order that the prosecutor investigate the role of several Drummond officials in the union murders be investigated. Defendant Bernal made sure nothing was done in the way of a serious investigation.

112.    Drummond's assertion that Plaintiff van Bilderbeek's payment of Blanco's attorney's fees was a bribe is false as a matter of law and fact. The payment was legal and ethical. Further, it was necessary to allow Blanco to be able to tell the truth without putting himself in

serious legal jeopardy. Blanco's testimony was not only considered credible in his criminal case, but it formed the foundation of Prosecutor No. 247's ongoing investigation in Colombia of numerous Drummond officials regarding their roles in financing the AUC.  Further, Blanco provided useful information to van Bilderbeek as per their agreement. Rafael Garcia, former deputy director of Colombia's Intelligence services (DAS), provided detailed testimony under oath under U.S. and Dutch law that the allegations against Llanos Oil and van Bilderbeek was completely fabricated by order of his former boss, Jorge Noguera Cotes, the former head of DAS now in prison for corruption. Garcia testified that former President Uribe orchestrated the false attacks on Llanos Oil to justify stripping Llanos of its oil exploration rights. There is no question this was for the benefit of Drummond, which illegally ended up with the Llanos rights. Jaime Blanco was able to obtain and provide additional details on this issue.

113.    Oscar Jose Ospino Pacheco ("Tolemaida") is the sole AUC witness in the *Balcero* case to provide Drummond with a declaration that denies there was a relationship between Drummond and the AUC. There is substantial evidence that Drummond paid Tolemaida to bribe and/or threaten various AUC witnesses to keep quiet about Drummond's relationship with the AUC. However, in late September 2017, faced with strong evidence presented to him by a Colombian prosecutor investigating Drummond's financing of the AUC, Tolemaida admitted that Jaime Blanco Maya had provided him with funding for his AUC front. Blanco's testimony on this point has been clear that he was one of the conduits for Drummond to funnel money to the AUC. Tolemaida is still denying that he had a direct relationship with Drummond, but Colombian prosecutors are confronting him with the strong evidence of his lies to protect Drummond. Based on information and belief, the Drummond Defendants continue to pay Tolemaida and Jorge 40 to

keep silent about their key roles in coordinating the AUC's war crimes with Drummond. Both of

them continue to threaten other potential witnesses to keep silent as well.

114.    Attached hereto as Exhibit 43 is a February 28, 2012 Declaration of Javier Ernesto

Ochoa Quiñonez ("El Mecanico"). He states:

> The day after I executed my declaration, on May 29, 2007, I was visited by
> Alexander Pianeta. He said that he was there on behalf of my AUC Commander,
> alias "Tolemaida", and that if I valued my family, I would not speak about
> Drummond. He also said that if I retracted my statement, Tolemaida would take
> care of me financially. The threat against my family was a serious one. As I stated
> in my May 28, 2007 statement, I was constantly concerned about whether I could
> say the wrong thing and endanger my family.

*Id.* ¶ 5. He also states:

> In 2010, my commander, Tolemaida, was arrested and was in La Picota prison in
> Bogota. I was taken, along with another AUC colleague, "JJ," by bus to La Picota
> and we met with Tolemaida. He said to us both that he was going to meet with
> Garry Drummond to make sure that we were all well provided for because we did
> not talk about Drummond. Tolemaida promised me 200 million Colombian pesos
> if I remained quiet about Drummond. Tolemaida also told us we had nothing to
> worry about because our good friend from Drummond, Alfredo Araujo, now had a
> son working as the Secretary to the Attorney General. Tolemaida showed me a
> letter from Araujo's son telling Tolemaida that he could count on his collaboration
> and support.

*Id.* ¶ 8. Additionally, he says, "It is common knowledge, and I personally heard from several

sources that Tolemaida received over one million U.S. dollars from Drummond to keep us all

quiet, however, he never sent me or my family any money." *Id.* ¶ 9.

115.    Attached hereto as Exhibit 44 is a March 1, 2012 Declaration of Jose Aristides

Peinado Martinez. He states:

> Tolemaida was captured much later than the rest of us in 2010. Under the pretense
> of requesting that I testify with him under the Justice and Peace process because he
> was my former commander, Tolemaida has requested that I be brought to Bogota
> to testify three times. The last time was about six or seven months ago. On each of
> these occasions he told me that Drummond was willing and ready to pay me if I
> kept quiet about what I know. Recently, lawyers for Drummond have requested a
> meeting with me, but I have declined to meet them.

*Id.* ¶ 28.

116.    Attached hereto as Exhibit 18 is a December 4, 2009 Declaration of Alcides Mattos

Tabares ("Samario"). He states:

> I understand that Drummond wanted to hide the truth of what had happened, having testimonies that excluded the company's participation in the homicides of the unionists. To that end, Alexander Pianeta, alias "Reyes," an army official and member of the Front, was taken to Bogotá in order to testify that all the actions had been carried out due to the fact that the unionists had been members of the guerrillas. Initially, they had me in mind. "Tolemaida" had offered me, through alias "Cebolla," a huge sum of money so that I testified to that extent, that the deaths were a product of their militancy in subversion. Sometime later, the lawyer José Daza Ortíz, who attended to the business interests of "Tolemaida" and of the Front, confirmed the offer of money that was made to me.

*Id.* ¶ 20.

117.    At the deposition of Alcides Mattos Tabares in the *Balcero* case, attached as Exhibit

45 he testified:

> Q.    Have you spoken with Tolemaida?
>
> A.    Yes, in Barranquilla.
>
> Q.    And did Mr. – did you discuss with Tolemaida the murder of the Drummond union leaders?
>
> A.    Yes. We had our differences because he did not want me to testify. Moreover he threatened me. He told me that he had enough money to buy all of the witnesses. Exactly he told me that Drummond had given him money to fix the process.
>
> Q.    This is something he told you supposedly?
>
> A.    Supposedly, no. He did tell me.

*Id.* at 123:6-16.

118.    Tabares further testified:

> Q.    Let me break it down so we don't have a problem. On the April 29th – April 23rd, 2009 testimony for Charris what did you tell the prosecutor and the

judge about your testimony?

A.     The safety of my family because they had been threatened.

Q.     Did the prosecutor or judge respond to your concern?

A.     Well, before then, before the prosecutor number 12, before the human rights Court, I had denounced that situation.

Q.     What situation are you referring to?

A.     To death threats. I made – I denounced this, you know, all the way from Barranquilla during one of the free versions before I believe Judge Daisy Jaramillo. I denounced the fact that an attorney hired by Tolemaida had gone – I think his name was Cesar Vaca – to the model penitentiary to threaten me. And that I remember this was something that happened to an extent that the guards had to react because I got very angry when I received these threats from Tolemaida.

Q.     And what was the nature of the threat?

A.     The testimony. You know, the testimony that I was beginning to provide during the justice and peace process and this was way before this.

Q.     Was there something that either Tolemaida himself or his lawyer Vagas or Vaca told you not to say?

A.     Yes. They didn't want me to testify. You know, they just didn't want me to provide testimony during the entire justice and peace process.

Q.     Testimony about what?

A.     Anything that pertained to the relationship between society and the AUC; anything pertaining to the death of the woman judge; anything pertaining to the link between the military and the AUC; anything pertaining to the deaths of the Drummond union leaders; anything pertaining to the politics, the relationship between politics and the front; anything pertaining to the creation of a political group for the front.

Q.     And you told Mr. Jeffress earlier that when you were in the jail in Barranquilla the same time as Tolemaida he offered you money; is that correct?

A.     (Speaking Spanish)

Q.     Let me ask another question then.

A.      Yes, and also –

Q.      What did he tell you exactly?

A.      Well, in Barranquilla Tolemaida offered all of us who were there in Barranquilla, all of the members of the front, money. He even proposed that I retract all of the statements that I had previously given because he had received monies – and he told me just like this, he had received monies from Drummond and that he was going to give everyone some money. And then after this apparently he had problems with everyone at the front because apparently he didn't give money to anyone. And in spite of this he was taking luxuries inside the jail and, of course, people got angry. Like, for example, building a door for the cell that costs 2 or 3 million pesos.

Q.      Did Tolemaida ever threaten you directly about the Drummond testimony?

A.      Yes, of course.

Q.      Can you tell me what he said?

A.      I remember that after a collective free version that was invalid legally for the reasons that I gave before, we had a small skirmish, you know, with me and one of the other candidates. And, you know, he practically told us that we had families outside and that he had money to – with which to do whatever he wanted. And, you know, that free version that was shown on the video lasted 6 or 12 weeks, but I was only there twice. And other candidates were only in attendance two or three days.

Q.      Were you present when Tolemaida either offered money to or threatened any of the other members of the Juan Andrés Álvarez Front besides you?

A.      Yes, of course.

Q.      Can you tell me who?

A.      Francisco Gaviria.

Q.      Anybody else?

A.      No. I only remember Francisco Gaviria and he denounced this.

*Id.* at 160:7-164:8.

119.     The Drummond Defendants also made specific threats to El Tigre not to testify about his knowledge of Drummond's substantial support to the AUC. He received threats of violence towards him and his family from Tolemaida and others. In addition, on February 11, 2010, while he was in prison and his family was in what he thought was a safe location, El Tigre was visited by Defendant Bernal, his close friend, William Pacheco Granados, a high level public prosecutor, and Nodier Agudelo Betancurt, a lawyer for Defendant Araujo. The three of them wanted him to recant his December 3, 2009 Declaration providing details about Drummond's relationship to the AUC, attached hereto as Exhibit 17. According to El Tigre, Defendant Bernal told him to "think very hard about what [he] was going to say, that these were very delicate matters." Agudelo also made general threats about the powerful people El Tigre had upset with his declaration. El Tigre was very concerned about his own family's safety because Defendant Araujo came from a family with a lot of money and power. El Tigre explained to Plaintiff Otero that Araujo was "protected by Hernando Molina Araujo who was convicted as a member of the AUC and is a person with a lot of power over illegal groups. I know that if Hernando Molina Araujo wanted to take his revenge on me he could easily kill all the members of my family."

120.     In response to the threats he received from Defendant Bernal and Defendant Araujo's lawyer, Agudelo, El Tigre stated in a June 17, 2011 Declaration, Exhibit 46:

> I have nothing left but my immediate family. I understood the threats that were made to me as saying that my family would suffer violent retaliation if I did not recant my December 3, 2009 Declaration . . . In other countries, in other contexts, such threats would be just threats. In Colombia, in the wake of the civil conflict and all of the powerful people who now want to deny their participation in the crimes of the AUC, such threats are concrete. I felt I had no choice but to repudiate my prior declaration. Consequently, I agreed to answer questions posed by Dr. Pacheco, Dr. Bernal, and Dr. Agudelo, and to sign the transcript, which is

dated February 11, 2010 . . . I had no choice as my family and I would be in grave danger if I did not.

121. El Tigre thus was forced to recant his December 3, 2009 Declaration. In a subsequent June 17, 2011 Declaration, made after he had confirmed that his family was in a safe location, El Tigre exposed the threats he had received and re-affirmed the truth of his December 3, 2009 Declaration linking Drummond to the AUC.

122. In March of 2018, El Tigre was summoned by a prosecutor to provide his testimony again about the early aspects of the AUC-Drummond relationship. He was told by the prosecutor that his prior testimonies on this topic given in the J&P process had "disappeared." El Tigre cooperated and repeated his key testimony regarding Drummond's funding of the AUC. When he had finished testifying, El Tigre informed Plaintiff Otero that the presiding Magistrate told him to be extremely careful because he had heard El Tigre and Otero's lives were in danger.

123. Despite the threats made against them by Tolemaida and others not to testify about Drummond's collaboration with the AUC, the key AUC participants in the collaboration with Drummond, including El Tigre, Samario, Peinado, Gelvis, Durate, Charris, Oscar David Perez Bertel ("Yuca"), and Jaime Blanco Maya, among others, have offered their testimony. Every one of these witnesses had security and legal issues, but ultimately they managed to provide their truthful testimony. Drummond was not able to silence these witnesses so, as is discussed herein, Drummond then sought to discredit the witnesses by accusing Plaintiffs of bribing them, when in fact, as the Drummond Defendants know, Plaintiffs were required to provide some of these witnesses with security or legal assistance to allow them to be able to testify truthfully, which they did.

124. The Drummond Defendants and Defendant Bernal successfully directly bribed Colonel Hernan Mejia, the former commander of the Popa Battalion. The Popa Battalion was

notorious for working directly with the AUC to report "false positives." After a massacre of civilians by the AUC, Colonel Mejia would have his men dress the murdered civilians in guerilla uniforms and claim them as FARC members killed in battle.

125.    Colonel Mejia specially informed Plaintiff Collingsworth that he received funds from Drummond through Defendant Araujo and that he funneled some of these funds to the AUC. He also told Plaintiff Collingsworth that, once he was arrested, Defendant Araujo, through a legal associate of Defendant Bernal, had promised him funds to keep quiet about his relationship with Drummond and the AUC. However, Araujo never provided the funds and Mejia was angry at Drummond for abandoning him once he was in prison. He agreed to testify for Plaintiff Collingsworth's human rights case. Collingsworth arranged for a Letters Rogatory to be issued for Mejia to testify.

126.    The evening before he was to testify, on July 12, 2012, Plaintiff Otero contacted Mejia to confirm that he was going to testify as scheduled. Mejia told him he was no longer willing to testify. Based on what he said and his abrupt change of plans, Plaintiff Otero was certain that Mejia had been given the funds previously promised by Defendant Araujo and had agreed to keep quiet.

127.    On July 13, 2012, Colonel Mejia was brought to the Colombian Court in Bogota to testify by the prison authorities. When the Court convened, Mejia announced that he was not going to testify and that he was asserting his right not to incriminate himself. The judge ruled that Mejia could not assert the right not to incriminate himself across the board, but would have the right to refuse to respond to specific questions that might elicit incriminating statements. When Plaintiff Collingsworth asked him questions regarding his prior statements that Drummond had provided him funding to funnel to the AUC, rather than refuse to testify, he denied ever making those

statements, and he denied that he received any funds from Drummond. One of Defendant Bernal's associates, Camilo Gomez, was present for the testimony and engaged in extended friendly banter with Mejia when the testimony was completed. While Mejia lied in giving his testimony in the Drummond case, he was ultimately convicted in Colombia for his criminal activity with respect to the false positives scandal.

## VIII. THE EVIDENCE ULTIMATELY GATHERED BY PLAINTIFFS COLLINGSWORTH, OTERO AND OTHERS ESTABLISHES THAT DRUMMOND PROVIDED KNOWING AND SUBSTANTIAL SUPPORT TO THE AUC'S HUMAN RIGHTS VIOLATIONS FOR THE BENEFIT OF DRUMMOND'S COLOMBIAN OPERATIONS.

128. Despite the Drummond Defendants' systematic use of corruption, bribes and threats to try to suppress the truth, the evidence that has emerged is clear that Drummond made an explicit agreement with the AUC and provided the group with substantial assistance in exchange for the AUC's agreement to use its brutal tactics to cleanse the areas around Drummond's coal mine, railroad line and port of all remnants of FARC guerillas, and their supporters and sympathizers. The Drummond Defendants knew that the AUC would use its well-established scorched earth terror tactics and that thousands of innocent civilians would be killed in the areas of Drummond's operations. To Drummond, this was an acceptable cost of doing business.

129. The participants in the Drummond-AUC collaboration were able to keep the fact of their arrangement under wraps until the 2006 J&P process, when individuals who were being charged with crimes in furtherance of Drummond's business interests began to reveal Drummond's role in the crimes.

130. One of the first key witnesses to talk was Jaime Blanco Maya, the former food service contractor for Drummond and close friend of Drummond manager Alfredo Araujo. Given the balance of the evidence, he had little choice but to plead guilty to conspiring with the AUC to

murder the two Drummond union leaders, Locarno and Orcasita. Not only were Blanco and Araujo friends, but they grew up in Valledupar with AUC leader Jorge 40. This triumvirate formed the central link in the AUC-Drummond relationship.

131.    Defendant Adkins and Blanco discussed the need for Drummond to provide regular payments to El Tigre, the commander of the AUC's Juan Andrés Álvarez Front, which was based along Drummond's rail line. Adkins went to Alabama and obtained Garry Drummond's agreement in 1996 to start paying El Tigre. This was done at first by Adkins bringing cash payments from Alabama in $10,000 increments (the maximum one is allowed to carry into Colombia). Thereafter, Adkins and Blanco developed a scheme to use inflated invoices from Blanco, and he would provide the overage to El Tigre. Blanco, El Tigre and Charris were very clear and consistent about this aspect of Drummond's scheme. Blanco and Charris, who worked daily with Drummond management, identified Garry Drummond, Defendants Jimenez, Adkins, Tracy, Araujo, and several other Drummond officials as being directly involved in the plan to provide the AUC with substantial resources.

132.    Drummond provided substantial assistance to the AUC *for the purpose of* siding with the AUC in Colombia's civil conflict and driving FARC guerillas out of Drummond's areas of operation, particularly its rail line. Charris testified that Drummond brought in AUC Commander El Tigre to "counteract or neutralize the activity and presence of the guerilla" and that bringing in the AUC was a "direct order from Garry Drummond because they were going through a crisis, a collapse, due to the guerilla attacks . . . to the railroad." Exhibit 34 A at 20:2-5. Charris further testified that "*[t]he commitment that El Tigre, Jim Adkins and myself had was to increase the forces of the AUC. It was -- the purpose was to increase the staff and to have a successful security of the mine, the railroad lines, and the purchase of weapons that El Tigre had so that*

*he could fulfill or cover all commitments with Drummond*." The "***Northern Bloc . . . was strengthened, and the selective massacres took place when Drummond had already provided the funds to the Northern Bloc***." *Id*. at 30:1-7; 31:5-8. Blanco confirmed "Adkins told me that Garry Drummond had authorized these payments himself in order to support the AUC . . . and minimize these attacks by the guerillas." Exhibit 42 at ¶ 26.

133.    AUC Commander El Tigre was present at a 1999 meeting with Jorge 40 and Araujo at which Araujo agreed Drummond would fund the AUC so that El Tigre would "clean up the area of guerillas," ***which El Tigre understood meant "killing all of the guerillas or guerilla men that are armed in the area*** <u>***and civilians as well***</u>***.***" Drummond's support allowed El Tigre to pay and equip 200 AUC troops. According to El Tigre, Drummond's "substantial payments allowed us to have more arms and men when we attacked [the FARC.]" He further stated "the Juan Andrés Álvarez Front . . . had an important presence . . . ***all along the Drummond railroad line, where we carried out our work of security, intelligence, and massacres in order to clean the railroad corridor***." Exhibit 17 at ¶ 14.

134.    AUC Commander Samario confirmed that Drummond provided most of the funds for his men to fight the guerillas in the area around Drummond's rail line and allowed him to add about 160 armed men to the Juan Andrés Álvarez Front. Exhibit 18 at ¶¶ 15-16.

135.    Drummond's substantial support for the AUC caused a surge of AUC combatants to occupy the areas in and around the Drummond facilities and its rail line, bringing an AUC reign of terror to the area. Another AUC witness, Gelvez, testified the arrival of the AUC to the area (around Drummond's coal mine) brought a wave of crime including "the daily murder of 30 to 40 people ... the amount of homicides that occurred between 1997, '98, and '99 was horrible." Exhibit 47 at 71:16-72:5.

136.    Another demobilized AUC combatant, Peindo, testified the AUC "continued to grow in size and strength, in large part due to the significant support provided by the Drummond company . . . The *Front engaged in regular and systematic cleansing campaigns to rid these areas of guerillas and their sympathizers . . . thousands of civilians were killed.*" Exhibit 44 at ¶ 8.

137.    El Tigre, Samario and Charis all agreed that once Drummond joined with the AUC in the civil conflict, *at Drummond's direction, the AUC prioritized driving FARC guerillas out of the areas of Drummond's operations* and escalated attacks on towns along Drummond's rail line, killing hundreds of innocent civilians. Samario testified that his orders were to protect the railroad line and he and his men proceeded to "wipe out" suspected FARC guerillas. Exhibit 18 at ¶ 18. Peinado added that *Drummond security manager Lineros directed the AUC to focus "cleansing operations" in specific towns along the Drummond rail line. Peinado participated in these cleansing operations and "hundreds of civilians were killed."* Exhibit 44 at ¶14.

138.    Under the orders of Defendant Adkins and Garry Drummond, Drummond's private security contractors coordinated security of Drummond's rail line with the AUC, and alerted the AUC if there were intruders along the rail line so that the AUC could respond and determine whether they were guerillas that required AUC engagement. Charris, the coordinator for Viginorte, was ordered by Adkins and Drummond to coordinate security with the AUC, which was directed by Drummond "to neutralize the activity and presence of the guerilla." Exhibit 34A at 20:2-15. Charris was directed by Drummond security managers "to control the presence of paramilitary forces in the area as well as the state security forces . . ." *Id*. at 49:10-18. Blanco agreed that Charris handled the AUC relationship for Adkins. Exhibit 42 at ¶ 48. Samario, one of the key men patrolling the Drummond rail line testified that security staff for Drummond reported to the AUC

whenever there were strange people in the area for the purpose of having the AUC kill them. "If they could not justify their being there they were assassinated." Exhibit 45 at 64:3-13.

139.    Yuca, another member of the AUC patrols, **stated that his AUC unit coordinated with "Drummond's security along the railroad line" and "carried out a cleansing campaign along the Drummond rail line."** Exhibit 49 ¶ 7.

140.    Another key way the Drummond Defendants financed the AUC, mainly through Defendant Araujo, was to purchase land the AUC unlawfully stole from innocent civilians living along the Drummond rail line. As previously alleged, the AUC would terrorize towns along the rail line and murder hundreds of innocent people merely because they lived near areas where the FARC controlled. After the AUC terrorized the local people, Hugues Manuel Rodríguez Fuentes, an AUC Commander known as Barbie, would either seize or buy for pennies on the dollar land owned by relatives of people who were murdered or otherwise terrorized. Barbie would make clear that the people should leave the area and there would be serious consequences if they refused. In this way, he accumulated large tracts of land.

141.    Barbie formed a company, Rodriguez Fuentes Investments Ltd., which held the land he acquired through AUC terror tactics. He then sold large portions of the land to Drummond, with his childhood friend Defendant Araujo handling the transactions for Drummond. When Barbie's role as an AUC commander became public knowledge, and the AUC was declared a terrorist organization by the U.S. government, Drummond could no longer engage in financial transactions directly with him. Defendant Araujo and Barbie solved the problem by having Barbie's wife, Maria Consuelo Pavajeau, create a new company, Inversiones Rodriguez Fuentes. This company was given title to all of the land Barbie seized, and Defendant Araujo, knowing of

the sham transaction and that Barbie was the beneficiary of the transactions, continued to purchase land for Drummond from Barbie through the new company.

142.    Defendant Araujo's purchases of land on behalf of Drummond from his close friend Commander Barbie helped to fund Barbie's AUC unit, and also allowed Barbie to fund other aspects of the AUC's mission. This was a common method used by the AUC to raise funds, and Commander Barbie's role in seizing land for Drummond is a matter of public record.

143.    According to published sources, Colombians who lost their land due to the AUC's reign of terror still risk their lives as they fight to get their land back:

> Can Colombia really return lost land to owners displaced by conflict?
> …[I]ntimidation and threats… suffered for reclaiming… land are part of a pattern of widespread abuses that threatens to thwart land restitution efforts, according to a new report by Human Rights Watch launched today in Bogota…
> 'In Colombia, trying to get your land back often means assuming risk and living in fear,' says José Miguel Vivanco, Human Rights Watch director for the Americas…
>
> After Rodríguez and other farmers from the property, known as El Toco, fled their farms in the late 1990s, the land was taken over by Hugues Manuel Rodríguez a well-known cattle rancher and paramilitary warlord who went by the name 'Commander Barbie.' Locals say Barbie installed a paramilitary base on El Toco and filled it with his cattle. – *The Christian Science Monitor,* September 17, 2013

144.    Human Rights Watch's 2013 report detailed the abuses handed out by the AUC and their successors to the displaced people who dared to claim the land stolen from them:

> Colombia's failure to significantly curb the power of paramilitary successor groups also poses a direct threat to land claimants' security, while more broadly undermining the rule of law in areas where IDPs seek to return. These groups inherited the criminal operations of the United Self-Defense Forces of Colombia (AUC) paramilitary coalition, which carried out widespread land takeovers prior to the government's deeply flawed demobilization process."

These displaced people face intimidation, threats and death:

> Widespread Abuses
> IDP land claimants and leaders have been subject to widespread abuses due to their restitution efforts, including killings, intimidation and threats, and new incidents of forced displacement. This report documents such cases involving victims reclaiming land through the Victims Law—and other restitution mechanisms—from the departments of Antioquia, Bolívar, Cesar, Chocó, Córdoba, La Guajira, Sucre, and Tolima, as well as Bogotá. Official data and other forms of evidence reviewed by Human Rights Watch indicate that the pattern of abuses extends throughout the country.

145.    *El Tiempo*, the major Colombian newspaper, reported that Drummond's U.S. attorneys Baker Botts held negotiations in Washington, DC with Hugues Rodriguez ("Commander Barbie") to facilitate Drummond's purchase of some of the land taken from the displaced people. Exhibit 50.

146.    Published reports indicate that at least one entire community in Cesar district – Mechoacán – was wiped off the map.

> In the Cesar Department, where the U.S.-owned Drummond mine operates, things are even worse. Union leaders there live in daily fear for their safety and lives.
>
> We had hoped to return to one community that we visited last summer, Mechoacán — but it had been wiped off the map. We met with the communities of Boquerón, El Hatillo, and Plan Bonito, that are slowly being strangled by the mine. Drummond, unlike Cerrejón, still refuses to recognize any right to collective relocation for these communities, and is simply trying to starve people out in hopes that they will leave. – *Interview with Aviva Chomsky on dissidentvoice.org, June 16, 2009*

147.    Colombian news sources have reported that Drummond already occupies most of the land expropriated from the Mechoacán community and plans to purchase them in foreclosure to expand the mine.

> Coal and Blood in the Lands of 'Jorge 40'
> …As stated in official documents, of 128 parcels in the Mechoacán community, 124 are occupied by Drummond. The law has part of these lands in foreclosure, and the US coal company needs to buy them to continue the expansion of the mine." – www.verdadabierta.com, October

26, 2010.

148.     There is overwhelming evidence that the Drummond Defendants knowingly provided substantial funding and other logistical assistance to the AUC's war crimes and other serious violations of human rights.

149.     In 2014, the Dutch section of PAX Christi International conducted a comprehensive and independent investigation of Drummond's collaboration with the AUC. PAX then issued a thorough report of the evidence, ***The Dark Side of Coal***.   The report concludes that there is substantial evidence that Drummond financed the war crimes of the AUC and caused the murders of hundreds of innocent civilians. Exhibit 51.

150.     PAX continued to research the emerging evidence and issued an updated report in 2016 that included new testimony and other evidence to support their initial report and conclusions. Exhibit 52.

151.     After reviewing the same evidence that PAX reviewed, Colombian Special Prosecutor No. 247 conducted his own independent investigation and interviewed the witnesses that Plaintiffs Collingsworth and Otero interviewed, and those PAX relied upon. He also interviewed numerous additional witnesses. He concluded on May 14, 2018 that there was sufficient evidence to open a formal investigation of Drummond's financing of the AUC's war crimes. He made the recommendation to formally investigate the Drummond Defendants to Attorney General Néstor Humberto Martínez and his Transitional and Delegate Justice Directorate Against Organized Crime committee. After months of delay due to Drummond's efforts to use its influence to prevent the criminal investigation, on October 9, 2018, Prosecutor No. 247 issued a formal notice of investigation of Drummond's financing of the AUC's war crimes. *See* Exhibit 6A.

152.     All of the Drummond Defendants' illegal acts in financing the AUC and covering up the evidence of their crimes were done to allow Drummond to continue meeting its obligations to supply coal to its customers. Drummond eliminated the union leaders to avoid work stoppages from strikes; Drummond encouraged the AUC's terror attacks on villages along its rail line to drive FARC guerillas and their supporters out of the areas of Drummond's operations, where they were disrupting coal shipments on the rail line; Drummond went to great lengths to cover up its illegal acts and collaboration in the AUC's war crimes and other atrocities in order to avoid losing major customers, most of them governments sensitive to whether their coal supplier was a war criminal.

## IX. THE DRUMMOND DEFENDANTS' COVER UP AND KNOWINGLY FALSE ATTACKS ON PLAINTIFFS, INCLUDING TWO "SLAPP" SUITS.

153.     Based on the facts alleged herein, Plaintiff Collingsworth, working with various lawyers and law firms across the years, filed several human rights cases against Drummond on behalf of Colombian victims of Drummond's war crimes and other serious human rights violations committed in collaboration with the AUC. The first was filed in early 2002, several months after the three Drummond union leaders, Locarno, Orcasita and Soler were murdered, and became known as *Romero v. Drummond Co. Inc*. CV-02-BE-0575-W. The plaintiffs were the widows of the murdered union leaders. A related case on behalf of the children of the murdered union leaders was filed by Plaintiff Collingsworth in 2009. *Baloco v. Drummond Co., Inc*., No. 7:09-cv-0557-RDP. Two subsequent cases were filed on behalf of persons who had a close family member murdered by the AUC while it was providing "security services" for Drummond along its rail line and committed war crimes and other atrocities in the towns in those areas. *Balcero v. Drummond Co., Inc*., No. 2:09-cv-1041-RDP and *Melo v. Drummond Co., Inc*., No. 2:13-cv-0393-RDP.

154.     During the course of all of these cases and up to the present, the Drummond Defendants lied about their roles in providing knowing and substantial assistance to the AUC. The Drummond Defendants were so certain that they and Defendant Bernal could keep their AUC allies quiet that they repeatedly testified under oath that they had never even met with or even had any communication with any member of the AUC. Defendants' criminal and corrupt efforts to bribe and threaten witnesses in Colombia have prevented the plaintiffs in the human rights cases from learning the entire truth about Drummond's role in the murders of their family members. Due to the J&P process in Colombia and Plaintiffs Collingsworth and Otero's actions in protecting the family members of some of the key AUC witnesses from violent retaliation, some significant evidence has come to light, but much of the Drummond Defendants' participation with the AUC in war crimes and other human rights atrocities remains covered up. Plaintiffs continue to work to develop this evidence

155.     There was substantial evidence gathered in the Justice and Peace process of Drummond's financing of and collaboration with the AUC, including the testimony of Mancuso, El Tigre, Samario, Peinado, Yuca, Mechanico, Jaime Blanco, and others. However, in Plaintiffs' efforts to find this evidence within the J&P Commission, they discovered most of it had "disappeared." Based on information and belief, Drummond, most likely through Defendant Bernal's efforts, managed to disappear the evidence specific to Drummond. Magistrates in the Justice and Peace process are re-calling these key witnesses and taking their testimony regarding Drummond's financing of and collaboration with the AUC.

156.     Knowing of their own direct participation in financing and collaborating with the AUC, and that they and others had bribed and threatened most of the key witnesses into silence, Drummond sued Plaintiff Collingsworth and his former law firm, Conrad and Scherer, LLP, for

defamation after Collingsworth wrote letters to two of Drummond's customers, the government of the Netherlands and Defendant Itochu. Collingsworth truthfully stated that Drummond was directly involved in financing and collaborating with the AUC's war crimes in Colombia. Collingsworth's September 19, 2011 letter to Defendant Itochu is attached as Exhibit 52A. The letter put Itochu on specific notice of Drummond's criminal enterprise in Colombia, and while even minimal due diligence by Itochu would have discovered Drummond's criminal acts in Colombia, the September 19, 2011 letter establishes the latest date the company was on notice and joined the criminal enterprise.

157.    Drummond's defamation case, *Drummond Co., Inc. et. al. v. Collingsworth, et al.*, No. 2:11-cv-3695-RDP, was filed as part of Drummond's overall strategy of aggressive denial of its collaboration with the AUC. Further, the defamation case was filed as a deliberate effort to damage the reputation and future business prospects of Plaintiff Collingsworth and Conrad and Scherer, LLP. Drummond's defamation lawsuit, along with Drummond's ongoing public smear campaign against Plaintiff Collingsworth, have in fact severely damaged Collingsworth's business opportunities, his fundraising efforts for his non-profit legal practice, and has caused severe damage to his well-established and hard-earned reputation as a public interest lawyer with great integrity.

158.    Drummond's defamation lawsuit is also a classic example of a SLAPP suit designed by Drummond to cost Plaintiff Collingsworth substantial time and resources to defend against the frivolous case. This is a tactic corporations like Drummond are increasingly using to retaliate against public interest lawyers who do sue them, and to serve as a warning to others that suing them in the future will have expensive and time-consuming consequences.

159.     Drummond's false assertions to the public that Plaintiff Collingsworth has bribed witnesses and paid them for false testimony against Drummond have in fact severely damaged Plaintiff Collingsworth's business interests, his fund-raising efforts and have damaged his reputation, as intended by Drummond. Plaintiff Collingsworth has lost substantial amounts of money, his reputation and standing in the legal community have been damaged, and he has suffered severe emotional distress as a result of Drummond's campaign to damage his reputation and place him in financial peril. Since Drummond's allegations about Plaintiff Collingsworth are false, there are no acts or occurrences by Plaintiff Collingsworth that could possibly relate to any of the allegations in this Complaint.

160.     When it was clear to Drummond that suing Plaintiff Collingsworth for defamation was severely damaging to him personally but did not halt him and his colleagues from continuing their efforts to hold Drummond accountable for human rights crimes in Colombia, Drummond filed a false and frivolous RICO case against Plaintiffs Collingsworth, Otero, and van Bilderbeek, among others. That case, *Drummond Co., Inc. et. al. v. Collingsworth, et al.*, Case No.: 2:15-cv-506-RDP, was likewise a SLAPP suit designed to harm these Plaintiffs financially and damage their reputations. The case was also part of a public campaign by Drummond to use all forms of press and internet communications to falsely accuse Plaintiffs Collingsworth, Otero, and van Bilderbeek with bribing witnesses and paying them to give false testimony against Drummond.

161.     Drummond's filing of the RICO case renewed its public campaign to damage Plaintiff Collingsworth and also Plaintiffs Otero and van Bilderbeek. Drummond's false assertions to the public that these Plaintiffs bribed witnesses and paid them for false testimony against Drummond have in fact severely damaged Plaintiffs Collingsworth, Otero, and van Bilderbeek's business interests and have damaged their reputations, as intended by Drummond. Plaintiffs

Collingsworth, Otero, and van Bilderbeek have lost substantial amounts of money, and their reputations and standing in their respective communities have been damaged. Plaintiffs Collingsworth, Otero and van Bilderbeek have suffered severe emotional distress as a result of Drummond's campaign to damage their reputations and place them in financial peril. Since Drummond's allegations about Plaintiffs are false, there are no acts or occurrences by Plaintiffs that could possibly relate to any of the allegations in this Complaint.

162.    As further described herein, Defendants' SLAPP suits are but one of many ways Defendants have sought to destroy Plaintiffs' reputations and damage them financially. Defendants SLAPP suits also do not involve or relate to Defendants' own cover up activities in Colombia and the United States. They also do not relate to Defendants' bribery and intimidation of witnesses in Colombia and the United States. The Drummond Defendants are engaged in a massive international cover up that depends upon bribery, threats, payments to Colombian officials and coordinated perjury by the Drummond Defendants and their collaborators.

163.    The Drummond Defendants have made and published false accusations about Plaintiffs Collingsworth, Otero and van Bilderbeek in various publications, including *Semana* and *El Tiempo*, the two most widely read and circulated publications in Colombia.  In an April 7, 2015 article in El Tiempo – Colombia's largest newspaper:

      a.    "Drummond's President Jose Miguel Linares has said that Drummond has vowed a ´campaign' to show how [the Plaintiffs herein] are a criminal venture."

      b.    Linares said,  "***the purpose of the campaign will continue to be showing how these lawyers and some NGOs have established an organization that the company qualifies as a criminal venture to commit extortion, bribery,***

*fraud, obstruction of justice, witness manipulation and money laundering."* [emphasis added] – *El Tiempo* - April 7, 2015, Exhibit 53.

164.    Defendant Linares, speaking for Drummond, made false accusations similar to Drummond's in an April 14, 2015 interview in *Semana*, the *Time Magazine* of Colombia. Similar statements have been made by Defendant Linares in various radio interviews, all falsely stating that Plaintiffs herein bribed various witnesses and paid them for false testimony against Drummond. Similarly, during the last week of October, 2018, when news became public that Prosecutor No. 247 opened a formal criminal investigation of Drummond's financing of the AUC's war crimes, Defendant Bernal made false statements to various media in Colombia saying repeatedly the false assertion that the testimony Plaintiffs Collingsworth and Otero obtained regarding Drummond's links to the AUC was the result of paying those witnesses to provide false testimony. The Drummond Defendants and Defendant Bernal made and published their false statements knowingly, or in reckless indifference to the truth, because the Drummond Defendants and Defendant Bernal know that any testimony linking them to the AUC's war crimes and other human rights atrocities is true. These false statements in various publications are still widely in circulation and are available from various internet sites and continue to damage the reputations of Plaintiffs. Various prosecutors, former colleagues, and funders have noted the *Semana* article and other statements by the Drummond Defendants and have questioned Plaintiff Collingsworth over the alleged bribes he paid to witnesses against Drummond. The harm to Plaintiff Otero's professional reputation in Colombia was particularly severe, and these false accusations also caused extreme problems for Plaintiffs Collingsworth and Otero in obtaining information and cooperation in Colombia. The harm to Plaintiffs from the circulation of these false accusations by the Drummond Defendants is ongoing.

165.    The Drummond Defendants have also made and published false accusations about Plaintiffs Collingsworth, Otero and van Bilderbeek on the Drummond website in various posts, including a current and ongoing post that purports to be a "response" to a report by PAX that, following their investigation, confirms Drummond's financing of and collaboration with the AUC. Once again, in "rebutting" this report, Drummond falsely asserts that these Plaintiffs bribed various witnesses and paid them for false testimony against Drummond. The Drummond Defendants made these false statements knowingly, or in reckless indifference to the truth, because the Drummond Defendants know that any testimony linking them to the AUC's war crimes and other human rights atrocities is true. These false statements on Drummond's website and elsewhere are still widely in circulation and are available from various internet sites. The harm to Plaintiffs from the circulation of these false accusations by the Drummond Defendants is ongoing.

166.    The Drummond Defendants have also made the same false accusations about Plaintiffs Collingsworth, Otero and van Bilderbeek to various criminal investigators in Colombia and the U.S. Drummond has repeatedly lied to criminal investigators about the Drummond Defendants' financing of the AUC by falsely claiming that evidence gathered by Plaintiffs establishing Drummond's collaboration with the AUC is false and resulted from Plaintiffs' bribing of various witnesses and paying them for false testimony against Drummond. The Drummond Defendants made these false statements knowingly, or in reckless indifference to the truth, because the Drummond Defendants know that any testimony linking them to the AUC's war crimes and other human rights atrocities is true. These false statements are ongoing, as is a criminal investigation in Colombia regarding Drummond's financing of the AUC. On information and belief, Defendant Bernal's major argument to Colombian prosecutors in keeping them from

charging the Drummond Defendants with financing the AUC is that Plaintiffs Collingsworth and Otero bribed witnesses.

167.    Drummond's false statements to criminal authorities damaged the reputation and credibility of Plaintiffs, and has caused substantial delay in allowing the Colombian and U.S. authorities to bring the Drummond Defendants to justice. The ongoing cover up and false statements by the Drummond Defendants has also prevented Plaintiffs Collingsworth and Otero from obtaining relief for their clients in the various civil cases they have filed as referenced in paragraph 3, *supra*.

## X. <u>CAUSES OF ACTION</u>

### <u>First Cause of Action</u>
### Violations of RICO, 18 U.S.C. § 1962(c)
### All Plaintiffs Against All Defendants

168.    Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 167 of this Complaint and all Exhibits to this Complaint as if set forth in full.

169.    At all relevant times, all Plaintiffs were and are a "person" within the meaning of 18 U.S.C. § 1961(3) and 1962(c).

170.    At all relevant times, each of the Drummond Defendants was and is a "person" within the meaning of 18 U.S.C. § 1961(3) and 1962(c). The three corporate Drummond Defendants, Drummond Company, Inc., Drummond Ltd., Drummond USA, Inc., are also persons within the statute. In Drummond's frivolous RICO SLAPP suit, it admitted as such.

171.    The Drummond Defendants and their co-conspirators are a group of persons associated together in fact for the purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint. The entire business plan for Defendants

Drummond Company, Inc., Drummond USA, Inc., and the individual Drummond Defendants was to set up and profit from the Colombian coal operations of Drummond Ltd., which is a criminal enterprise. Collaborating with the AUC, a terrorist organization, murdering the leaders of the trade union in the coal mine, bribing government officials, threatening and bribing witnesses, seizing and otherwise unlawfully acquiring land and mineral rights, covering up their illegal acts, and the other criminal acts alleged herein were all to ensure that Drummond Ltd. could extract and ship coal on a timely basis to comply with Drummond's contracts. The Drummond Defendants and their co-conspirators have perpetrated, and continue to perpetrate, a massive and multifaceted campaign of lies, fraud, corruption and bribery. Because Plaintiffs sought to expose this criminal enterprise, the Drummond Defendants aimed their criminal and corrupt power at the Plaintiffs to discredit them, damage their professional reputations, and damage their business interests, as described herein.

172.    The Drummond Defendants and their co-conspirators run a transnational business, with the key decisions and financing based in Alabama, the coal extraction and shipment, made possible by the criminal acts alleged herein, occurring in Colombia, and the sale of their coal, tainted by blood and corruption, occurring in the Netherlands, Japan, and California, among other places. This criminal enterprise has been structured to operate as a unit in order to accomplish the goals of their criminal scheme: to extract high value coal using unlawful means and sell it on the world market, while lying, stealing, bribing and threatening witnesses, and engaging in other criminal acts to cover up the criminal acts involved in running the Colombian coal operations to avoid losing major public customers that would refuse to purchase coal produced through unlawful acts.

173.     The individual Drummond Defendants, Garry N. Drummond (Drummond's Estate is named as a Defendant herein), James Michael Tracy, James Adkins, Alfredo Araujo Castro, Augusto Jimenez, and Jose Miguel Linares, all acting on behalf of Drummond Company, Inc., and Drummond USA, Inc. played a major role in operating Drummond Ltd. as a criminal enterprise. Each of them had a major role in using the AUC to commit war crimes that benefited Drummond Ltd.'s business operations, each of them played a major role in covering up their criminal acts to avoid losing business for Drummond Ltd., each of them, working with Defendant Bernal, participated in corruption of Colombian officials to avoid criminal investigation and prosecution, and each of them had a role in bribing or threatening witnesses to prevent them from providing evidence of Drummond's criminal enterprise. The Drummond Defendants also have been utilizing false evidence in judicial proceedings and blatantly lying in judicial proceedings about their criminal enterprise and have misused the judicial process by bringing false claims against Plaintiff in an effort to cover up their own criminal acts. Further, the Drummond Defendants have all participated in a massive international media campaign designed to spread false and misleading information about Plaintiffs also to cover up their own criminal acts. This is Drummond's way of doing business, and the Drummond Defendants have usually not faced any roadblocks to their criminal schemes. This explains their systematic and costly effort to stop Plaintiffs from their efforts to expose Drummond's criminal acts. Other cracks are occurring in Drummond's dependence on criminal acts as their business model. On July 20, 2018, an Alabama jury convicted Drummond Vice President, David Roberson, who was acting on behalf of Drummond, of bribing an Alabama state legislator to obtain his assistance in stopping the Environmental Protection Agency from expanding a Superfund toxic cleanup site in North Birmingham. If Drummond was willing and able to bribe a public official in Alabama where the rule of law applies, there is no

limit to how far the Drummond Defendants would go in the corrupt atmosphere of Colombia where they have managed to buy significant influence and political protection.

174.    The Drummond Defendants, operating through the criminal enterprise of Drummond Ltd. constitute an enterprise fitting the meaning of 18 U.S.C. § 1961(4) and 1962(c). Each of the Drummond Defendants participated in the operation or management of the Enterprise.

175.    At all relevant times, the Drummond criminal Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

176.    The Drummond Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Drummond criminal enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c). From its inception, Drummond Ltd. was built on major criminal activity. As alleged herein, the Drummond Defendants conspired with others to murder the union leaders at Drummond Ltd. to avoid work stoppages and other labor disputes that would hamper meeting production and shipment deadlines. The Drummond Defendants conspired with others to seize, steal, or otherwise acquire land by unlawful means to explore for and extract minerals. The Drummond Defendants conspired with others to retain the AUC as a private security force to protect its rail line from attacks by guerilla groups that hampered meeting production and shipment deadlines. Then, to avoid losing major public-sector clients, like the government of the Netherlands or the State of California, and to avoid civil and criminal liability in both the U.S. and Colombia that would shut the Colombian coal business down, the Drummond Defendants began and continue to the present a major criminal scheme to lie about and cover up their criminal activity.

177.    Once Plaintiffs tried to expose Drummond's criminal acts to the public through education and legitimate legal proceedings, Drummond focused its illegal cover up campaign on attacking Plaintiffs and making false statements designed to cause damage to Plaintiffs' reputations and business interests, as well as avoid civil liability in the human rights cases Plaintiffs Collingsworth and Otero brought against them. Drummond also took this retaliatory step to prevent Plaintiff van Bilderbeek from recovering damages following the Drummond Defendants' unlawful appropriation of Llanos Oil's mineral rights in Colombia. Among the criminal acts involved in Drummond's cover up and attack on Plaintiffs, Drummond committed multiple instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. The Drummond Defendants engaged in a multifaceted and massive scheme to cover up its criminal acts that were fundamental to Drummond Ltd.'s operation and to attack Plaintiffs. In doing so, the Drummond Defendants deceived the U.S. and Colombian judicial systems, and corruptly influenced and deceived the media and general public. The Drummond Defendants knew that exposure of their crimes in Colombia would put an end to their Colombian coal operations and subject the Drummond Defendants to criminal and civil liability. In furtherance of their scheme, and as described herein, the Drummond Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier. These included emails and website postings incorporating false and misleading statements denying Drummond's criminal acts and false statements about Plaintiffs accusing them of bribing witnesses. These also included communications between the Drummond

Defendants concerning their criminal acts and efforts to cover up their crimes, and the submission of false testimony and false statements to judicial authorities in the U.S. and Colombia.

178.    The Drummond Defendants participated in the scheme knowingly, willfully and with the intent to protect their business interests in Colombia and to avoid civil and criminal liability for their underlying criminal acts that developed the successful operations of Drummond Ltd. The Drummond Defendants knowingly, willfully and with intent attacked Plaintiffs, who were viewed by Drummond as the primary threat to their cover up scheme, and sought to destroy their reputations and future business prospects.

179.    The Drummond Defendants' false and misleading statements, and their false testimony and evidence denying their collaboration with the AUC in Colombia, have been relied upon by U.S. courts, U.S. law enforcement agencies, Colombian courts, Colombian law enforcement agencies, Drummond's customers, the media, and the general public. Drummond Defendants' false and misleading statements have caused Plaintiffs substantial injury resulting in significant damages.

180.    As alleged above and illustrated in the Exhibits referenced in this Complaint and attached hereto, the Drummond Defendants have paid Defendant Bernal to bribe Colombian officials, and in conjunction with others, bribe or threaten potential witnesses. In this way, the Drummond Defendants procured false testimony from witnesses or prevented them from testifying. This ongoing activity constitutes a pattern of racketeering activity through money laundering in violation of 18 U.S.C. § 1956(a)(2)(A). The Drummond Defendants have on multiple occasions and continuing to this day knowingly caused the transportation, transmission, and/or transfer of funds to or from the United States to themselves and to Defendant Bernal with the intent that those funds be used to promote the carrying on of unlawful activity, including but not limited

to violations of 18 U.S.C. § 201, 1341, 1343 and 1951, including payments to Colombian witnesses to keep quiet about Drummond or provide false statements that Drummond did not collaborate with the AUC.

181.   In an additional pattern of racketeering activity, the Drummond Defendants and Defendant Bernal have obstructed justice in violation of 18 U.S.C. § 1503. In a concerted effort to protect their business interests in Colombia and to avoid civil and criminal liability for their underlying criminal acts that developed the successful operations of Drummond Ltd., the Drummond Defendants have filed or caused to be filed documents, including declarations sworn under penalty of perjury and other statements, that falsely claim that Drummond had no involvement at all with the AUC in Colombia and Plaintiffs bribed witnesses to say that Drummond financed the AUC. They have also suborned the perjured testimony of several third parties, including Tolemaida and Jorge 40, the AUC Commanders that the Drummond Defendants collaborated with directly and paid substantial sums of money to.

182.   The Drummond Defendants have made these misrepresentations with full knowledge that their statements were false and they did so with the intent to protect their business interests in Colombia, to avoid civil and criminal liability, and, by falsely accusing them of bribing witnesses, damage Plaintiffs' reputations and business prospects. By making these deliberate and false representations in various federal judicial proceedings, with full awareness of their consequence and with the specific intent to corruptly endeavor to influence, obstruct, and impede the due administration of justice, the Drummond Defendants have committed multiple instances of obstruction of justice in violation of 18 U.S.C. § 1503.

183.   In a further pattern of racketeering activity, the Drummond Defendants and Defendant Bernal bribed and threatened numerous witnesses with the intent to influence the

testimony of these witnesses.  The Drummond Defendants paid substantial sums of money to Tolemaida and Jorge 40, the AUC Commanders that the Drummond Defendants collaborated with directly, in order to buy their silence. On information and belief, Drummond paid other witnesses to keep them quiet as well. In exchange for these funds, these witnesses provided false testimony that Drummond had no relationship to the AUC or simply refused to testify about Drummond. The Drummond Defendants and Defendant Bernal also threatened numerous other witnesses and told them they and their families would face serious and violent consequences if the witnesses revealed Drummond's close relationship with and financial support for the AUC. These included El Tigre, Samario, Mechanico, Yuca and Peindo. Drummond has so far managed to escape both civil and criminal liability for its unlawful conduct in Colombia because of its effective silencing of many witnesses in violation of 18 U.S.C. § 201. The Drummond Defendants' payments to some witnesses and threats of violence against other witnesses also constitutes a pattern of racketeering activity in tampering with witnesses in violation of 18 U.S.C. § 1512.

184.    Each of the Drummond Defendants has engaged in multiple predicate acts, as described above.  The conduct of each of the Defendants described above constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).  The Drummond Defendants and Defendant Bernal continue to make false statements to Colombian authorities in denying their relationship with the AUC, and the Drummond Defendants continue to make false statements to the press, the public and in U.S. judicial proceedings to cover up their past criminal acts and falsely accuse Plaintiffs of bribing witnesses as part of the cover up. On information and belief, the Drummond Defendants continue to make payments and/or provide support, including legal assistance to Tolemaida and Jorge 40. The witnesses who have truthfully testified that Drummond financed the AUC continue to receive threats. Among others, El Tigre was warned in February,

2018 by the Magistrate Judge in the Justice and Peace process that his life was in danger. Not only is the Drummond Defendants' illegal conduct ongoing, they are certainly likely to continue the unlawful activity in the future, particularly in order to influence and impede the ongoing criminal investigations against Drummond in Colombia, and the pending *Melo* civil case in the U.S.

185.     As a separate basis for RICO liability, Section 1962(a) prohibits any person from using or investing any income derived from a pattern of racketeering activity. Drummond Ltd. is thriving and is earning hundreds of millions of dollars each year. If the Drummond Defendants had not successfully, to date, covered up their prior criminal acts, they would have lost most or all of their business and suffered significant criminal and civil liability. Instead, the tainted profits of the have been used to build and expand the production and shipment of coal in Colombia. The Drummond Defendants are thus using and investing income derived from a pattern of racketeering activity in violation of 18 U.S.C. § 1962(a). The Drummond Defendants are also using the unlawful proceeds of their pattern of racketeering activity to pay lawyers and media consultants to attack Plaintiffs with false accusations they bribed witnesses, all done for the purpose of damaging Plaintiffs' reputations and their business interests.

186.     Plaintiffs were injured in their businesses by reason of the Drummond Defendants' violations of 18 U.S.C. § 1962(a) and (c).  The injuries to Plaintiffs caused by the Drummond Defendants' violations of 18 U.S.C. § 1962(a) and (c) include but are not limited to the attorneys' fees, costs, and other expenses incurred defending themselves from the false accusations of witness bribery, lost business opportunities due to Drummond's false charges of witness bribery, disruption of their businesses, including substantial loss and diversion of time of key personnel and damage to their relations with professional colleagues, and substantial expenses of responding to and dealing with the political and public effects of the Drummond Defendants' false accusations

and wrongful denial of their criminal relationship with the AUC. The injuries to Plaintiffs were a but for, direct, proximate, and reasonably foreseeable result of the Drummond Defendants' violations of 18 U.S.C. § 1962.  Plaintiffs have been and will continue to be injured in their business and property until the true facts are established at trial. Plaintiffs will establish their damages at the time of a trial.

187.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the Drummond Defendants.

**Second Cause of Action**
**Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)**
**All Plaintiffs Against All Defendants**

188.    Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 187 of this Complaint and all Exhibits to this Complaint as if set forth in full.

189.    The Drummond Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

190.    Based on their intentional actions to use false evidence and statements to cover up criminal acts to protect their business and avoid criminal and civil liability, and their knowingly false accusations that Plaintiffs were bribing witness to give false testimony, the Drummond Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

**Third Cause of Action**
**Defamation**
**All Plaintiffs Against All Defendants**

191.    Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 190 of this Complaint and all Exhibits to this Complaint as if set forth in full.

192.    Drummond intentionally, maliciously and/or recklessly published and caused to be published false and defamatory statements about Plaintiffs accusing them of bribing witnesses to give false testimony that Drummond financed the AUC.

193.    Drummond published on its websites the Open Letter and Press Releases, which contain false statements, accusations, insinuations, and implications, knowing that the statements, accusations, insinuations, and implications were false or acting in reckless disregard of whether they were false or not. Most of these published defamatory assertions are still in circulation and remain on Drummond's website.

194.    The false statements, accusations, insinuations, and implications were directed at Plaintiffs.

195.    Drummond acted with the intent to injure and prejudice Plaintiffs in the public perception, to injure their business and professional reputations, and to impute dishonesty and immoral and criminal behavior to them.

196.    Plaintiffs have been damaged because of Drummond's defamation and hereby demand judgment against Drummond for general, compensatory and punitive damages as to be determined by a jury, as well as costs and such other relief as the Court or jury deems just.

**Fourth Cause of Action**
**Intentional Interference With Prospective Economic Advantage**

**All Plaintiffs Against All Defendants**

197.   Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 196 of this Complaint and all Exhibits to this Complaint as if set forth in full.

198.   The Drummond Defendants each knew that Plaintiffs' business activities were dependent upon their good reputations and the record of accomplishments in their fields. Further, the Drummond Defendants each knew that Plaintiffs' business activities required them to have both the time and resources to focus on developing and performing agreed work for prospective clients or partners.

199.   The Drummond Defendants' wrongful acts as alleged herein in mounting an intentional campaign to damage the reputations of Plaintiffs caused Plaintiffs to spend considerable time and resources responding to the Drummond Defendants attacks in the public domain, in the courts of Colombia and the U.S., and dealing with investigators and responding to press attacks and social media attacks.

200.   The Drummond Defendants' caused each of the Plaintiffs to lose substantial business opportunities resulting in lost income both because prospective clients or partners did not seek out the services of Plaintiffs because of their damaged reputations and because Plaintiffs lacked the time and resources to attend to any some of the potential new business opportunities while consumed with addressing the impact of the Drummond Defendants' wrongful campaign against them.

**Fifth Cause of Action**
**Intentional Interference With Contractual Relations**
**Plaintiff Collingsworth Against All Defendants**

201.    Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 199 of this Complaint and all Exhibits to this Complaint as if set forth in full.

202.    The Drummond Defendants each knew that Plaintiff Collingsworth was a partner in the law firm of Conrad & Scherer, LLP and that the law firm was paying him an annual partner draw. They also knew that Conrad & Scherer, LLP was paying all or most of the costs involved in Plaintiff Collingsworth's efforts from 2008 on to hold Drummond accountable for human rights crimes in Colombia.

203.    The Drummond Defendants' wrongful acts as alleged herein in mounting an intentional campaign to damage Plaintiff Collingsworth's reputation, and in singling him out as the "ringleader" of the effort to hold Drummond accountable, was designed to and did cause Conrad and Scherer to separate from Plaintiff Collingsworth and terminate all payments to enable Plaintiff Collingsworth to hold Drummond accountable for human rights claims.

204.    The Drummond Defendants' caused Conrad and Scherer to separate from Plaintiff Collingsworth, resulting in Plaintiff Collingsworth losing income and funds to cover costs in his human rights cases, including those against Drummond. Plaintiff Collingsworth has not been able to find alternative sources to replace his income and funds for costs due to the damage that the Drummond Defendants have inflicted upon his professional reputation.

**Sixth Cause of Action**
**Intentional Infliction of Emotional Distress**
**All Plaintiffs Against All Defendants**

205.    Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 204 of this Complaint and all Exhibits to this Complaint as if set forth in full.

206. The Drummond Defendants' wrongful acts as alleged herein in mounting an intentional campaign to damage the reputations of Plaintiffs and cause them financial hardship is extreme and outrageous conduct that is ongoing.

207. The Drummond Defendants extreme and outrageous conduct was done intentionally or recklessly with the knowledge that destroying a person's longstanding professional and personal reputation would cause that person extreme emotional distress.

208. Plaintiffs each suffered extreme emotional distress at the damage to their reputations and living with the precarious financial situation created by the Drummond Defendants' wrongful acts. Each of the Plaintiffs suffered extreme stress, anxiety, physical pain, loss of sleep, and damage to their personal relationships.

## XI. <u>PRAYER FOR RELIEF</u>

### RICO CLAIMS

209. Based on the RICO allegations of the first and second causes of action set forth above, Plaintiffs are entitled to general damages, trebled in accordance with 18 U.S.C. § 1964(c) against the Drummond Defendants. Plaintiffs also seek their statutory reasonable costs and attorney's fees they incurred in pursuing this action.

210. Wherefore, Plaintiffs demand judgment for compensatory damages in an amount to be determined by a jury and trebled pursuant to statute, as well as interest, attorney's fees, costs and expenses, and such other relief as the Court and/or jury deem just.

### STATE LAW CLAIMS

211.    Based on the state law claims of their third, fourth, fifth and sixth causes of action set forth above, Plaintiffs seek compensatory and punitive damages from the Drummond Defendants in an amount to be determined by a jury.

212.    Wherefore, Plaintiffs demand judgment for compensatory and punitive damages in an amount to be determined by a jury, and such other relief as the Court and/or jury deem just.

## XII. JURY DEMAND

213.    Plaintiffs demand a trial by jury on all issues triable by a jury alleged in their Complaint.


Respectfully submitted this _____ day of April 2019.

/s/ *Terrence P. Collingsworth*
Terrence P. Collingsworth
Executive Director
INTERNATIONAL RIGHTS ADVOCATES
        621 Maryland Ave. NE
        Washington, D.C. 20002
        202-543-5811
        tc@iradvocates.org

Attorneys for Plaintiffs